**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JERRY R. KENNEDY, et al.** | : | **Case No.  C2-03-1047** |
| **Plaintiffs,** | : | **JUDGE MARBLEY** |
| **v.** | : | **MAGISTRATE JUDGE ABEL** |
| **CITY OF ZANESVILLE, et al.** | : | |
| **Defendants.** | : | |

## MOTION FOR SUMMARY JUDGMENT BY MUSKINGUM COUNTY DEFENDANTS

Muskingum County Defendants move this Court for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure for the following reasons:

- Plaintiffs' Claims Are Barred By The Applicable Statutes Of Limitations
- Plaintiffs Have No Direct Evidence Of Discrimination And Cannot Prove A Prima Facie Case Under *McDonnell Douglas*
- Defendants Don Madden, Ed Kenily, and Dorothy Montgomery Are Qualifiedly Immune
- Plaintiffs' Claims For Injunctive Relief Are Moot
- Plaintiffs May Not Recover Punitive Damages Against Muskingum County
- Muskingum County Is Immune From Plaintiffs' State Law Claims

Respectfully submitted,

/s/ __Mark Landes_____

Mark Landes, Trial Counsel       (0027227)
marklandes@isaacbrant.com
Jessica K. Philemond           (0076761)
jkp@isaacbrant.com
Isaac, Brant, Ledman & Teetor, LLP
250 East Broad Street
Columbus, Ohio  43215
(614) 221-2121; Fax (614) 365-9516
*Attorneys for Muskingum County, Ohio,*
*Ed Kenily, Don Madden, and Dorothy*
*Montgomery*

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ..................................................................................iv

**MEMORANDUM IN SUPPORT** ........................................................................ 1

   **I.**     **SUMMARY** .............................................................................................. 1

   **II.**    **STATEMENT OF THE FACTS** ............................................................ 4

      Muskingum County Acquires A Source Of Water ....................................... 5

      Muskingum County Did Not Provide Water Before December 2000 ................ 7

      A Coal Run/Langan Lane Project Is Proposed To The City Of Zanesville ........... 7

**LAW AND ARGUMENT** .................................................................................. 12

   **I.**     **PLAINTIFFS' CLAIMS ARE BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS** ................................................................ 12

     **A.**   **The Applicable Statutes Of Limitations.** ................................................. 12

        **1.**   **A Two-Year Statute of Limitations Applies to Count One, Claims under the Fair Housing Act, 42 U.S.C. § 3601.** ........................................ 12

        **2.**   **A One-Year Statute of Limitations Applies to Count Two, Claims under 42 U.S.C. § 1981.** ............................................................ 13

        **3.**   **A Two-Year Statute of Limitations Applies to Counts Three and Four, Claims under 42 U.S.C. § 1982 and 42 U.S.C. § 1983.** ................... 13

        **4.**   **A One-Year Statute of Limitations Applies to Count Five, Claims under Title VI of the Civil Rights Act.** .................................................. 14

        **5.**   **A One-Year Statute of Limitations Applies to Count Six, Claims under O.R.C. § 4112.02(H).** .............................................................. 14

        **6.**   **The Ohio Civil Rights' Complaint Is Time-Barred One Year After Filing Of The Discrimination Charge.** .............................................. 14

     **B.**   **Accrual Of A Cause Of Action.** ............................................................ 15

     **C.**   **Claims Are Time-Barred For All Plaintiffs In Group One (Non-Residents).** ........ 20

     **D.**   **Claims Are Time-Barred For All Plaintiffs In Group Two (Non-Requesters).** ...... 20

     **E.**   **Claims Are Time-Barred For Cynthia Hairston.** ...................................... 21

**F. The Continuing Violations Doctrine Does Not Apply.** ............................................. 21

**II. MUSKINGUM COUNTY DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFFS FAIL TO STATE A CLAIM** .................. 23

**A. Some Plaintiffs Have Membership In A Minority Class.** ......................................... 23

**B. There Is No Direct Evidence Of Discrimination.** ...................................... 24

**1. The Alleged Statement By Dorothy Montgomery Has No Racial Connotation.** ......................................................................... 24

**2. The Alleged Statements By Commissioner Dorothy Montgomery Do Not Constitute Action Under Color Of State Law.** ...................................... 25

**C. Plaintiffs Cannot Establish A Prima Facie Case Of Discrimination.** ...................... 28

**1. Membership In A Protected Class.** ...................................................... 29

**2. Requests For Public Water Service Were Not Made.** ......................................... 29

**3. No Requests For Public Water Service Were Denied.** ......................................... 35

**4. Plaintiffs Were Treated No Differently Than Other Similarly Situated Applicants Of An Unprotected Class.** ...................................... 36

**a. There is no relationship between water line locations and racial demographics in Muskingum County.** ......................................... 36

**b. Residents Living On The Northern Portion Of Langan Lane.** ....................... 37

**c. Adamsville, Chandlersville, and Gaysport Areas.** ............................................ 37

**d. Other Neighborhoods Near The City Limits.** ...................................................... 39

**D. Plaintiffs Have No Evidence Of Discriminatory Conduct By County Defendants** .40

**E. The County Has A Legitimate, Non-Discriminatory Reason For Its Actions.** ........ 41

**III. PLAINTIFFS WHO HAD PUBLIC WATER SERVICE DO NOT HAVE A CLAIM AGAINST THESE DEFENDANTS** ............................................................. 42

**IV. DEFENDANT COMMISSIONERS DON MADDEN, ED KENILY, AND DOROTHY MONTGOMERY ARE QUALIFIEDLY IMMUNE** ......................... 42

**V. PLAINTIFFS ARE BARRED FROM RECOVERING PUNITIVE DAMAGES AGAINST MUSKINGUM COUNTY** .......................................................... 44

**VI.**     **PLAINTIFFS' PRAYER FOR INJUNCTIVE RELIEF IS MOOT AND
        PLAINTIFFS HAVE NO STANDING TO ASSERT A CLAIM FOR
        INJUNCTIVE RELIEF** ................................................................. 45

**VII.**    **PLAINTIFFS FAIR HOUSING ADVOCATES ASSOCIATION AND THE OHIO
        CIVIL RIGHTS COMMISSION SHOULD BE DISMISSED** ................................ 45

**VIII.MUSKINGUM COUNTY DEFENDANTS ARE IMMUNE FROM STATE
        CLAIMS**.................................................................................. 46

**CONCLUSION** ..................................................................................... 46

**CERTIFICATE OF SERVICE** ................................................................. 47

## **TABLE OF AUTHORITIES**

### **Cases**

*Alexander v. Local 496, Laborers' Int'l Union,* 177 F.3d 394, 402 (6th Cir.1999) ............... 20, 28

*Allen v. Ethicon, Inc.,* 919 F.Supp. 1093, 1098 (S.D.Ohio 1996) .................................. 23

*Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006) ........................................ 25

*Asbury v. Brougham,* 866 F.2d 1276, 1279 (10th Cir.1989) ........................................ 20, 28

*Behrens v. Pelleiter*, 116 S.Ct. 834 (1996) .................................................. 43

*Browning v. Pendleton*, 869 F.2d 989, 992 (6th Cir. 1989) (en banc)........................................ 13

*Canady v. Klaiber*, 2007 WL 81858, *6 (N.D. Ohio 2007) ........................................ 23

*City of Los Angeles v. Lyons*, 461 US 95 at 107-109 (1983) ........................................ 45

*City of Newport v. Fact Concerts*, 453 U.S. 247, 271 (1981)........................................ 44

*Cleveland v. Ibrahim,* 2003 WL 24010953, at *2 (N.D.Ohio May 29, 2003) ............................ 23

*Coleman v. Cleveland School District Board Of Education*, 2004 Ohio 5854 (8th Dist., 2004) .. 46

*Collyer v. Darling,* 98 F.3d 211, 220 (6th Cir.1996); *Ruff v. Runyon,* 258 F.3d 498, 500-01 (6th Cir.2001) ................................................................................ 15

*Cooey v. Strickland*, 2007 WL 623482 (6th Cir. 2007) .................................... 15, 16, 18

*Crawford v. Britton*, 118 S.Ct. 1584 (1998) .................................................. 43

*Estate of William J. Bing v. City of Whitehall*, 456 F. 3d 555, 569 (6th Cir. 2006) .................... 43

*Fabrey v. McDonald Village Police Dept*., 70 Ohio St. 3d 351, 639 NE 2d 31 (1994) .............. 46

*Goodman v. Lukens Steel Co*., 482 U.S. 656, 660 (1987) ............................................ 13

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ........................................ 43, 44

*Horne v. Russell County Commission*, 379 F. Supp. 2d 1305 (M.D. Ala. E.D. 2005)................... 26

*Jeffries v. Harleston,* 52 F.3d 9 (2d Cir.1995) .................................................. 26

*Kallstrom v. City of Columbus*, 136 F. 3d 1055, 1068 (6th Cir. 1998)........................................ 45

*Kennedy v. City of Cleveland,* 797 F.2d at 298, 299 (6th Cir. 1986), *cert denied*, 479 U.S. 1103 (1987)................................................................................ 43

*King v. City of Eastpointe*, No. 01-2303, 2003 U.S. App. LEXIS 25712, at * 32-33 (6th Cir. December 4, 2003) ........................................................................................................ 24

*Kocak v. Cmty. Health Partners of Ohio, Inc.* 400 F.3d 466, 470 (6th Cir. 2005) ....................... 24

*Kocsis v. Multi-Care Mgmt., Inc.,* 97 F.3d 876, 882-83 (6th Cir.1996) ...................................... 41

*Kuhnle Brothers, Inc. v. County of Geauga*, 103 F.3d 516, 522 (6th Cir. 1997).......................... 21

*Miller v. Administrative Office of Courts*, 448 F.3d 887, 894 (6th Cir.2006) ............................. 43

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) .................................................................................. 43

*Monell v Dept. of Social Services*, 436 U.S.658 (1978) .............................................................. 44

*National Advertising Co. v. City of Raleigh*, 947 F.2d 1158, 1166 (4th Cir. 1991) ..................... 21

*Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)............................................... 24

*Ohio Civil Rights Commission v. Countrywide Home Loans, Inc.*, 99 Ohio St. 3d 522 (2003) ... 15

*Paasewe v. Ohio Arts Council*, 2003 WL 22017539 (6th Cir. 2003) ........................................... 23

*Paschal v. Flagstar Bank*, 295 F.3d 565, 572 (6th Cir. 2002) .................................................... 35

*Plant v. Morton Int'l, Inc.,* 212 F.3d 929, 936 (6th Cir.2000)..................................................... 41

*Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir.1995) ...................................................... 20, 28

*Reynolds v. Quarter Circle Ranch, Inc.* 280 F.Supp.2d 1235, *1241 (D.Colo.,2003) .......... 20, 28

*Saucier v. Katz,* 533 U.S. 194, 200 (2001) ................................................................................. 43

*Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 260-263 (6th Cir. 2006) ........... 26, 27

*Sevier v. Turner,* 742 F.2d 262, 273 (6th Cir.1984)................................................................... 15, 17

*Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003) .............................................................. 21

*Silberstein v. City of Dayton,* 440 F.3d 306, 311 (6th Cir.2006) ............................................... 43

*Sutton v. Bloom*, 710 F.2d 1188 (6th Cir. 1983) ....................................................................... 13

*Talley v. Bravo Pitino Rest.*, 61 F.3d 1241, 1248-49 (6th Cir. 1995)........................................ 25

*Tolbert v. State of Ohio Dep't of Transp.*, 172 F.3d 934, 939 (6th Cir. 1999); 42 U.S.C. § 3613. ................................................................................................................................ passim

*Wilson v. Garcia*, 471 U.S. 261, 266-68 (1985) ........................................................................ 13

## Constitutional Provisions and Statutes

42 U.S.C. § 1981 ................................................................................................ 13, 17

42 U.S.C. § 1983 ................................................................................ 13, 17, 21, 26, 44

42 U.S.C. § 2000d ...................................................................................... 14, 17, 23

42 U.S.C. § 3601 ............................................................................................... 17

42 U.S.C. § 3613(a)(1)(B) ................................................................................... 12

42 U.S.C. §§ 1982 and 1983 ............................................................................... 13

42 U.S.C. 3601-3604 ......................................................................................... 23

Chapter 6117 of the Ohio Revised Code. ............................................................... 5

Fair Housing Act, 42 U.S.C. § 3601 ............................................................ 12, 17, 23

O.R.C. 2744.01(F) ............................................................................................. 45

O.R.C. 2744.02(A) ............................................................................................. 46

O.R.C. 2744.05 ................................................................................................. 45

O.R.C. 2744.09(E) ............................................................................................. 45

O.R.C. 4112.02(H) ............................................................................................. 14

O.R.C. 4112.05 ................................................................................................. 13

O.R.C. 4112.05(B)(7) ......................................................................................... 15

O.R.C. 4112.051 .......................................................................................... 13, 14

O.R.C. 6119 ....................................................................................................... 5

Civ. R. 56 ......................................................................................................... 11

S.D. Ohio Civ. R. 7.2(e) ....................................................................................... 1

The Civil Rights Act of 1866, 42 U.S.C. § 1982 ............................................... 13, 17

Title VI of the Civil Rights Act ..................................................................... 14, 17, 23

<u>**MEMORANDUM IN SUPPORT**</u>

**I.    SUMMARY**

Of the sixty-eight individuals who have filed this lawsuit alleging race discrimination with regard to the provision of public water service, sixty-seven have never requested water from Muskingum County Defendants[1], twenty-seven have not lived in the neighborhood at issue for over ten years[2], and three Plaintiffs admitted in their depositions that they actually did have public water service, even though they have sued Defendants alleging otherwise.[3]

Plaintiffs have presented this case under a theory that, in the "Coal Run/Langan Lane neighborhood" (where Plaintiffs reside), "the water line stops where the color line begins." (Complaint, ¶ 90, 91).  Plaintiffs have falsely represented that the reason the situation exists is because of government action by the political subdivisions sued in this case.  (See Complaint, generally).  The undisputable truth is that <u>no government action</u> was involved in the laying of the water line that Plaintiffs complain serves white residences at the northern portion of their neighborhood.  (John Michel Depo., p. 28)[4].  The undisputable truth is that that water line was constructed by a group of private residents who, in the 1950's, paid for and laid their own water lines.  (Michel Depo., p. 52-53, 54-55, 131).  The location of that private group's water line did create a situation in the Coal Run/Langan Lane neighborhood where a majority of white

---

[1] See Exhibit, Plaintiffs That Did Not Request Public Water From Muskingum County, at Appendix Page 1.  Due to the large number of exhibits referenced in this Motion, Muskingum County Defendants have prepared an Appendix pursuant to S.D. Ohio Civ. R 7.2(e) and have filed it electronically with the Court.  Defendants will refer to evidentiary support in this Memorandum by referencing the applicable Appendix page.

[2] See Exhibit, Plaintiffs That Did Not Live In Coal Run/Langan Lane At The Time Their Alleged Claims Accrued, Appendix Page 2.

[3] See Deposition of Judy Newman, p. 24; Deposition of Goldie Newman, p. 17-18; Deposition of Mary Kennedy, p. 13.

[4] This, and all other deposition testimony cited throughout, will be filed with the Court in a Joint Defendants' Exhibit Appendix filed pursuant to S.D. Ohio Civ. R. 7.2(e).

residents (the private group) had access to a water line, whereas minority residents, who lived south of the private water line, did not. Muskingum County had nothing to do with this.

In fact, prior to December 2000, Muskingum County's Board of Commissioners did not own a source from which it could provide water. (See Cooperative Water Agreement, Appx. p. 141). The first three groups to receive water from Muskingum County were those who had expressed a significant interest through letters, petitions, and other requests. (See Petitions, Appx. pp. 63, 73, 123, 129, 130, 174, 177, 179, 180, 189, 192, 197). At that time, the County had received no petitions, letters, or requests for water service from residents of the Coal Run/Langan Lane neighborhood. (See Affidavit of Muskingum County Commissioners, Appx. p. 57). In fact, the only request the County ever received was an oral request by Jerry Kennedy and Richard Kennedy, Jr., at a public hearing on December 13, 2001. (Id). Even though the Coal Run/Langan Lane citizens had not formally petitioned the County for water, the County surveyed the area for interest by September 2002 (Howard Depo., p. 126) and water lines were laid by December 2003, within 25 months of that request.

The Coal Run/Langan Lane project was the fourth water project initiated and completed by Muskingum County and her Board of Commissioners, while still over twenty other water projects have been requested and planned by Muskingum County and will be constructed several years _after_ the Coal Run/Langan Lane project. (See Affidavit of Don Madden, ¶ 13, Appx. p. 11). Indeed, Commissioner Don Madden still does not have public water service at his residence. (Madden depo., p. 23). Commissioner Dorothy Montgomery did not receive public water service at her residence until November of 2002. (See Application for Water Service, Appx. p. 175). Commissioner Kenily had to twice dig a well at his residence and petition the East Muskingum Water Authority before he received public water at his residence in Falls

Township, Muskingum County.  (Kenily depo., p. 10-11).  After the completion of the Coal Run/Langan Lane project, nearly 100% of African American residents in the County are set up with public water service, in contrast to only about 50% of white residents.

Despite the above, no fewer than seventeen attorneys have appeared against Muskingum County and the other Defendants in this case, with current estimated fees totaling $2,036,831.25 as of September 15, 2006.  (See Appx. p. 58).  The Plaintiffs, individuals of both white and minority races who live in a neighborhood they refer to as "Coal Run/Langan Lane," located within Washington Township, Muskingum County, Ohio, allege that Defendants, the City of Zanesville, Washington Township, and Muskingum County, Ohio, denied them public water service because of their race and the race of their neighborhood.  (Doc. 114, generally)[5].  The Fair Housing Advocates Association and the Ohio Civil Rights Commission are also joined as Plaintiffs.  (Doc. 50; 114).

To expedite the discovery process in this case, Muskingum County Defendants issued written discovery requests to Plaintiffs asking, among other things, whether each individual Plaintiff had ever requested public water service from Muskingum County.  Plaintiffs responded to Muskingum County with this generic response:

Interrogatory No. 5:

Did you at any time make a request for public water to Muskingum County or any of its agents or employees?  If so, state (a) the date and time the request was made, (b) what form the request was made (oral, written, or otherwise), (c) who the request was made to, (d) that person's title of employment within the County, and (e) what that person's response to your request was.

---

[5]    Plaintiffs have amended their Complaint, principally dropping their claim for class status. The current operative pleading is the Fourth Amended Complaint, Doc. 114, which will be referred to herein as the "Complaint."

Response to Interrogatory No. 5:

        Plaintiff objects on the grounds described in the general objections.  Plaintiff further objects on the grounds that the Interrogatory is vague and ambiguous.  Plaintiff further objects to the extent the Interrogatory seeks information uniquely within the ken of the Defendant.  Plaintiff further objects on the grounds that the Interrogatory is compound.  Subject to, and without waiving objections, Plaintiff states as follows:

        The Defendant Muskingum County has been aware of Plaintiff and all other Coal Run/Langan Lane neighborhood residents' need, desire, and standing request for water since the 1960's.  In addition, Plaintiff refers Defendant to the Responses to Township Interrogatory No. 11 and City Interrogatory No. 18.

(See, e.g., Interrogatory Responses for Plaintiff Frederick Martin, Appx. p. 215).  Because of this non-response, Muskingum County and the other Defendants were forced to expend the resources to depose every single Plaintiff.  Discovery proved that, of the sixty-eight Plaintiffs, only two have actually requested public water service from Muskingum County.

Muskingum County allocates water resources based on need and requests, and the Plaintiffs who are complaining about being ignored were given public water access within 25 months of two Plaintiffs' oral requests to the County.  The decision to allocate scarce water resources should not be sidetracked by false allegations of racial discrimination.  Such meritless charges are even less credible when one considers the fact that currently 100% of the Plaintiffs have been set up for public water, while only about 50% of white County residents are set up for public water.  As a result of Muskingum County's efforts, Plaintiffs all have access to public water service.  Plaintiffs' Complaint should be dismissed.

## II.  STATEMENT OF THE FACTS

Unlike Franklin County and other more-developed counties in Ohio, Muskingum County is still somewhat in its infancy in creating a public water service infrastructure.  Prior to the year 2000, Muskingum County had 56 public water systems scattered throughout the county, some of which were municipal water/sewer districts, but most of which were simply water sources

established by business entities and residential subdivisions that were making inefficient use of their water resources.  (See Letter of Intent, Appx. p. 137).  Prior to 2000, Muskingum County controlled no water source, nor did it have a county water department.  (Madden Affidavit, ¶ 3, Appx. p. 9).  To this day, a significant percentage of Muskingum County's residents do not have public water and must use either well water or cisterns as the means of providing their homes with water.  (Madden Affidavit, ¶ 11, Appx. p. 10).

<u>Muskingum County Acquires A Source Of Water</u>

Leading up to the year 2000, Muskingum County Commissioners recognized that the growing number of independent water systems in the County, which were virtually impossible to monitor, would present a dangerous situation to the public health and safety, with increased risk of contamination.  (Letter of Intent, Appx. p. 138).  The County resolved to establish a countywide water and sewer district to be formed under the provisions of Chapter 6117 of the Ohio Revised Code.  (Id.).  In order to do so, Muskingum County required a water source. Therefore, the Muskingum County Board of Commissioners requested that the East Muskingum Water Authority ("EMWA"), the largest water district in the County, consider cooperating with Muskingum County in studying the possibility of a merger.  (Id., Appx. p. 139).  On December 13, 1999, Muskingum County Commissioners issued an official Resolution regarding their intent to merge with the EMWA.  (Appx. p. 140).

The EMWA had been established in 1967 when it petitioned the Muskingum County Common Pleas Court for the establishment of a water authority pursuant to O.R.C. 6119.  (See, Journal Entries, Appx. pp. 133 and 208).  At the same time that the EMWA was established, a small and independent water authority known as the Washington Rural Water Authority ("WRWA"), was already operating within a portion of the EMWA's jurisdiction.  The WRWA

was formed in approximately the year 1956 by a private group of citizens living just north of the Coal Run/Langan Lane neighborhood.  (Michel Depo., p. 16-17).  The WRWA used private monies and private contractors to lay water lines for their residences, which included addresses on Adamsville Road and the northern portion of Langan Lane.  (Michel Depo., p. 52-53, 54-55, 131).  These water lines connected to the City of Zanesville's water system by City Ordinance dated January 8, 1956, and the individuals were sold water by the City of Zanesville.  (Appx. p. 117).  Muskingum County took no part in the planning, construction, or funding of this private water line.  (John Michel Depo., p. 28).

At the time, the WRWA was not an official "water authority" pursuant to Ohio statute. In July of 1982, the WRWA sought the EMWA's permission to allow their group to be removed from the EMWA's territory.  (See Correspondence, Appx. p. 112).  The EMWA agreed to remove the WRWA, so long as the WRWA would define the area to be removed and limit the area to the area actually being served by the City of Zanesville.  (See Correspondence, Appx. p. 114).  On October 29, 1984, the EMWA petitioned for the WRWA to be removed from the EMWA's territory and, on January 13, 1985, the WRWA became a legal water authority under Ohio law.  (See Petition to Amend, Appx. p. 212, and Journal Entry, Appx. p. 109).

On December 7, 2000, Muskingum County Commissioners entered into a Cooperative Agreement with the EMWA which allowed the County to purchase a 10% interest in the EMWA's water treatment plan and well field.  (Cooperative Water Agreement, Appx. p. 141). This marked the first time that Muskingum County had a water source from which it had the power or ability to provide public water service.  (Madden Affidavit, ¶ 3, Appx. p. 9).  On October 23, 2002 an Acquisition and Dissolution Agreement was executed between Muskingum County and the EMWA.  (Appx. p. 160).  The EMWA was formally dissolved by the

Muskingum County Common Pleas Court on February 28, 2003, the year this case was filed. (See Judgment Entry, Appx. p. 170).

<u>Muskingum County Did Not Provide Water Before December 2000</u>

Before Muskingum County took over the EMWA in 2003, it did not make decisions regarding where water lines were laid throughout the County. (Madden depo., p. 89). The County only participated in conjunction with helping provide funding for economic development projects for commercial or industrial needs. (Madden depo., p. 89). Once Muskingum County acquired a water source in December 2000, it gave priority for public water lines to areas that had for decades petitioned for public water service and also had great need. The first three projects planned by Muskingum County Commissioners included the Adamsville Road, Gaysport, and Chandlersville Road projects. Adamsville Road residents had repeatedly petitioned the EMWA and had even petitioned the Ohio Department of Natural Resources to try to get water to their area because of their poor quality of water due to mining in the area. (See Petitions, Appx. pp. 73, 129, 130, 180, 189, 192, 197). Over one-hundred fifty residents in the Gaysport area had submitted written petitions for public water service. (Appx. p. 63). Individuals, businesses, and even the Muskingum County/City of Zanesville Health Department had petitioned for water to be brought to the Chandlersville area, where the quality of ground water was unsafe. (Appx. pp. 123, 174, 177, 179).

<u>A Coal Run/Langan Lane Project Is Proposed To The City Of Zanesville</u>

Unlike the first three planned projects, Muskingum County and its Commissioners had never received any petition from residents in the Coal Run/Langan Lane neighborhood requesting public water service. (See Commissioners' Affidavit, Appx. p. 57). However, in the fall of 2000, County Commissioner Don Madden was approached by Jay Bennett, public service

director for the City of Zanesville, regarding a possible Coal Run Road water project. (Madden depo., pp. 107-112).

The City of Zanesville had been contacted in 1999 or 2000 by Joyce Hill, a personal friend of many of the residents in the Coal Run/Langan Lane neighborhood and an employee of the Ohio Department of Development, regarding the fact that the neighborhood did not have public water. (Joyce Hill depo., p. 53, 23, 62). Joyce Hill contacted Connie Quarles, Fair Housing and Contract Compliance Officer for the City of Zanesville, who set up a meeting with Bob Pletcher, the City's water superintendent, and Jay Bennett, public service director for the City of Zanesville. (Joyce Hill depo., p. 62, 63). Joyce Hill did not contact anyone from Muskingum County regarding this meeting. (Joyce Hill depo., p. 177).

Mr. Bennett indicated to Mr. Madden that the City of Zanesville was considering extending water in the Coal Run area and sought the County's involvement in applying for a Community Development Block Grant ("CDBG"). (Madden depo., p. 113). Mr. Bennett indicated that the City would construct the water project if the County could obtain the grant funding. (Madden depo, p. 113). The reason the County was required to apply for the CDBG grant was because the Coal Run/Langan Lane neighborhood was located within Muskingum County, outside the City of Zanesville limits. (Madden depo., p. 121). The County Commissioners agreed that they were willing to assist the City of Zanesville with financing of water lines in the Coal Run/Langan Lane area by applying for the CDBG grant. (Madden Affidavit, ¶ 5, Appx. p. 10).

Sometime later, Jay Bennett left the City of Zanesville and Mike Sims took over. (Madden depo., p. 122). On or about December 2001, Mr. Madden met with Mr. Sims regarding the Coal Run project, at which time Mr. Sims had an engineering proposal estimating the project

at a cost of over $1.9 million. (BBS Corporation Report, Appx. p. 77; Madden depo. p. 122). Mr. Madden was surprised at the cost, as he had an understanding that the cost of running water pipes was, on average, about $125,000 per mile. (Madden depo., p. 122). The Coal Run project was approximately a four-mile project, and so a $2,000,000 estimate seemed unreasonable. (Madden depo., p. 122). Indeed, the City of Zanesville's own water superintendent, Robert Pletcher, had estimated the cost of the project at just over $435,000. (Pletcher Study, Appx. p. 125, Section VI). Mr. Madden took the engineering proposal (Appx. p. 77) back to his fellow Commissioners who agreed that it was not fair to debt-service a $2,000,000 water project on the residents of Coal Run. (Madden depo., p. 123).

Commissioner Madden did not drop the idea of a Coal Run Road water project, and instead, discussed with the EMWA a planned water project of theirs that would serve Pleasant Grove Road and was being considered for construction in the year 2002. (Madden depo., p. 124; Madden Affidavit ¶ 9, Appx. p. 10). That project would bring a water source close to the Coal Run/Langan Lane neighborhood, making a Coal Run project feasible for the County to construct. (Id.). In an e-mail sent from Joyce Hill to other employees within the Ohio Department of Development on December 10, 2001, Ms. Hill referenced that she was told that the County would be looking at the Coal Run area for a water project in 2003. (E-mail, Appx. p. 132). This was before any resident of the Coal Run/Langan Lane neighborhood had even petitioned Muskingum County, Ohio for public water service.[6]

---

[6] The Pleasant Grove water project was ultimately constructed by the EMWA in the year 2002 and did in fact provide the water source that allowed Muskingum County to provide water to the Coal Run/Langan Lane neighborhood in 2003. (Madden Affidavit ¶ 10, Appx. p. 10; Cynthia Hairston depo., p. 31, indicating their household was connected to the water line in January of 2004).

At some point, Joyce Hill developed a strategy that involved laying the framework for filing a complaint of race discrimination.  In either 1999 or 2000, Joyce Hill told Jerry Kennedy and Richard Kennedy, Jr. that filing a lawsuit or a complaint with the Ohio Civil Rights Commission was an option.  (Joyce Hill depo., p. 82; 167; 181).  They indicated to Joyce Hill that they were interested in doing so.  (Joyce Hill depo., p. 82).  In her experience with fair housing laws, Joyce Hill knew that a typical fair housing complaint requirement was to have a recent "denial of services."  (Joyce Hill depo., p. 168).  Joyce Hill proposed to Jerry Kennedy and Richard Kennedy, Jr. that they should attend a December 13, 2001 County public hearing to be held regarding a water project proposed in the Chandlersville area.  (Joyce Hill depo., pp. 73-74).  Joyce Hill told the Kennedy brothers to attend the meeting and to ask for water to be brought to the Coal Run area.  (Joyce Hill depo., pp. 73-74).  Joyce Hill admits that one of the purposes for the Kennedys to attend the meeting was to "establish a recent date for the Refusing to Provide Municipal Services Complaint" that they would file.  (Joyce Hill depo., p. 169).

Jerry Kennedy and Richard Kennedy, Jr. did attend the December 13, 2001 Chandlersville public hearing.  (See Sign-In Sheet, Appx. p. 43).  Jerry Kennedy did express concerns for the lack of water in his area.  (Minutes, Appx. p. 61).  Even though the hearing was to discuss water in another area, the Muskingum County Commissioners resolved to check with the statutes of the water situation in that area of the county.  (Appx. p. 61; Affidavit of Otis Crittenden, Appx. p. 44; Affidavit of Gerald Jones, Appx. p. 55).  The meeting then ended.  It is now alleged in Plaintiffs' Complaint that Commissioner Dorothy Montgomery stated to Jerry Kennedy, at that public meeting, that there would be no water there "until President Bush drops spiral bombs in the holler" and that Jerry Kennedy's "grandchildren's grandchildren would not have water."  (Complaint, ¶¶ 158, 159).  There were nine people in attendance at that meeting,

including an engineer from M-E Companies and a private resident from the Nashport area of the county.  (Sign-In Sheet, Appx. p. 43).  Of those nine people, only Jerry Kennedy and Richard Kennedy, Jr. claim that these statements were made.  In fact, those in attendance at that meeting have sworn, under oath, that the alleged comments were not made.[7]  (Appx. pp. 44, 55).

Only two Plaintiffs, Jerry Kennedy and Richard Kennedy, Jr., claim to have requested public water service from Muskingum County.  (See Exhibit, Appx. p. 6 and Section II(C), below).  That request was oral, and was made at a public hearing called for another purpose.  (Minutes, Appx. p. 61).  Moreover, no petitions requesting public water service were ever submitted to Muskingum County by any individuals in the Coal Run/Langan Lane neighborhood.  (Affidavit of Commissioners, Appx. p. 57).  Still, within twenty-five months of Jerry Kennedy and Richard Kennedy, Jr.'s oral request for public water, the entire neighborhood had access to public water service.  The Coal Run Road water project was only the fourth water project completed by Muskingum County and there are an astonishing number of water projects that still are desperately needed.  (Madden Affidavit, ¶¶ 13, 14, Appx. p. 11).  Nevertheless, Plaintiffs now have public water service and have sued these Defendants seeking to take from the County the already limited resources it has to provide the remaining half of the County with public water.

---

[7]    Richard Kennedy, Jr. has been convicted of falsification for lying to a police officer. (See Certified Copy of Conviction Records, Appx. p. 14).  Even at his deposition, however, when he was sworn under oath, he denied this conviction.  (Richard Kennedy, Jr. depo., pp. 81-82).  We understand that even a liar can make an issue of fact under Rule 56, and we argue herein that this statement does not create a genuine issue of material fact.  However, the Court should have the means to appreciate the strength of the Plaintiffs' claim of the County's denial.

## LAW AND ARGUMENT

I. **PLAINTIFFS' CLAIMS ARE BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS**

For purposes of analyzing whether Plaintiffs' claims are time-barred under the applicable statutes of limitations, Plaintiffs fit into four groups:

Group One:  All Plaintiffs who did not live in the Coal Run/Langan Lane neighborhood at the time their alleged claims accrued.

Group Two:  All Plaintiffs who never made a request for public water from Muskingum County.

Group Three: Plaintiff Cynthia Hairston, who alleges that she was "expressly denied" public water service from a Muskingum County official in the year 2000. (Complaint, ¶ 156).

Group Four: Plaintiffs Jerry Kennedy and Richard Kennedy, Jr., who claim that a request for public water was denied at a Muskingum County public hearing on December 13, 2001. (Complaint, ¶ 158).

As is explained below, all claims alleged by Groups One, Two, and Three are time-barred. As to Group Four, all claims alleged in the Complaint, except for alleged claims from the December 13, 2001 public hearing, are time-barred.

A. **The Applicable Statutes Of Limitations.**

1. **A Two-Year Statute of Limitations Applies to Count One, Claims under the Fair Housing Act, 42 U.S.C. § 3601.**

Claims under the Fair Housing Act are subject to a two-year statute of limitations. *Tolbert v. State of Ohio Dep't of Transp.*, 172 F.3d 934, 939 (6th Cir. 1999); 42 U.S.C. § 3613. The statute is tolled when an administrative action is pending. 42 U.S.C. § 3613(a)(1)(B). Therefore, Plaintiffs are barred from proceeding on claims of discrimination that accrued before July 26, 2000, two years before the date the Ohio Civil Rights Commission Complaint was filed.

**2.      A One-Year Statute of Limitations Applies to Count Two, Claims under 42 U.S.C. § 1981.**

Plaintiffs' claims under 42 U.S.C. § 1981 are subject to a one-year statute of limitations. See, *Sutton v. Bloom*, 710 F.2d 1188 (6th Cir. 1983). In *Sutton*, the Sixth Circuit held that where the essence of a § 1981 claim is racial discrimination in housing, as it is in this case, the applicable statute of limitations is 180 days as outlined in O.R.C. 4112.05. Id. at 1191. Since that time, the statute has been amended and the applicable statute of limitations is one-year under O.R.C. 4112.051. Therefore, no Plaintiff in this case may bring any claims against these Defendants for alleged claims under Count Two that accrued prior to November 13, 2002, which is one-year prior to the filing of Plaintiffs' Complaint with this Court on November 13, 2003. (Doc. 1).

**3.      A Two-Year Statute of Limitations Applies to Counts Three and Four, Claims under 42 U.S.C. § 1982 and 42 U.S.C. § 1983.**

Plaintiffs' claims under 42 U.S.C. §§ 1982 and 1983 are subject to two-year statutes of limitations. Because §§ 1982 and 1983 do not contain a statute of limitations, federal courts should select the most appropriate or analogous state statute of limitations. *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660 (1987) (citing *Wilson v. Garcia*, 471 U.S. 261, 266-68 (1985)). In *Browning v. Pendleton*, 869 F.2d 989, 992 (6th Cir. 1989) (en banc), the Court confirmed that "the appropriate statute of limitations for 42 U.S.C. § 1983 civil rights actions arising in Ohio requires that actions be filed within two years after their accrual." Because Ohio's two-year statute of limitations for a personal injury claim is most analogous to Plaintiffs' §§ 1982 and 1983 claims, this is the limitations period that applies to Counts Three and Four.

Based upon the foregoing, no Plaintiff in this case may bring any claims against these Defendants under Counts Three or Four that accrued prior to November 13, 2001, as Plaintiffs' filed their Complaint in this Court on November 13, 2003. (Doc. 1).

### 4. A One-Year Statute of Limitations Applies to Count Five, Claims under Title VI of the Civil Rights Act.

Plaintiffs' claims under Title VI of the Civil Rights Act are subject to a one-year statute of limitations and are time-barred. Because 42 U.S.C. § 2000d does not contain a statute of limitations, the applicable statute is that most appropriate under state law. As explained above, the essence of Plaintiffs' claims is racial discrimination in housing. Therefore, the one-year statute of limitations as set forth in O.R.C. 4112.051 applies and no Plaintiff in this case may bring any claims against these Defendants under Count Five that accrued prior to November 13, 2002, as Plaintiffs' filed their Complaint in this Court on November 13, 2003. (Doc. 1).

### 5. A One-Year Statute of Limitations Applies to Count Six, Claims under O.R.C. § 4112.02(H).

Plaintiffs' claims pursuant to O.R.C. § 4112.02(H) are subject to a one-year statute of limitations. *Sutton v. Bloom*, 710 F.2d 1188 (6th Cir. 1983); O.R.C. § 4112.051. Therefore, no Plaintiff in this case may bring any claims against these Defendants for alleged claims under Count Six that accrued prior to November 13, 2002.

### 6. The Ohio Civil Rights' Complaint Is Time-Barred One Year After Filing Of The Discrimination Charge.

Two charges of discrimination were filed with the Ohio Civil Rights Commission ("OCRC"), one on July 26, 2002 and the other on July 31, 2002. The OCRC filed their "Joined Plaintiffs Complaint" in this Court on August 11, 2004. (Doc. 50). The OCRC initially filed a Complaint in the Muskingum Common Pleas Court on December 19, 2003, more than one year after the filing of either charge.

14

The Ohio Supreme Court held in *Ohio Civil Rights Commission v. Countrywide Home Loans, Inc.*, 99 Ohio St. 3d 522 (2003) that Ohio law requires that suit be filed within one year of the filing of the charge with the OCRC, pursuant to O.R.C. 4112.05(B)(7). Because the OCRC failed to file their Complaint within one year of the filing of either charge, its claims are time-barred.

**B.    Accrual Of A Cause Of Action.**

As is explained below, Plaintiffs who admit to never having made a request for public water service have no claim against these Defendants. With regard to the Plaintiffs who have alleged a denial of a request for public water service, their cause of action accrues when Plaintiffs knew or had reason to know that the act providing the basis of their injury occurred. *Collyer v. Darling,* 98 F.3d 211, 220 (6th Cir.1996); *Ruff v. Runyon,* 258 F.3d 498, 500-01 (6th Cir.2001); *Sevier v. Turner,* 742 F.2d 262, 273 (6th Cir.1984). As is explained below, assuming, arguendo, that Plaintiffs have a cause of action, it apparently accrued in December 2000, at which time Plaintiffs allege that the County "knew of the pressing need for running water in the Coal Run/Langan Lane neighborhood" and, despite that knowledge, "deliberately chose to proceed with the scheduled water projects in areas they knew were predominately white." (Complaint, ¶ 155).

The recent Sixth Circuit case of *Cooey v. Strickland*, 2007 WL 623482 (6th Cir. 2007) is illustrative. Plaintiff in *Cooey*, an inmate sentenced to death by lethal injection, challenged the method of death. The question for the Sixth Circuit was upon what date the inmate's cause of action accrued. Cooey had been sentenced to death in 1986. His conviction and sentence were affirmed by the Ohio Supreme Court on direct appeal in 1989, and the United States Supreme Court affirmed in 1991. Lethal injection became available as a means of execution in Ohio in

1993 and, in 2001, it became Ohio's sole method of execution.  Cooey received a letter from

staff counsel for the Ohio Department of Rehabilitation and Correction dated May 30, 2002

which described the procedures used by prison personnel in performing lethal injection and the

quantities used.  The district court concluded that Cooey's claim accrued when his execution

became imminent and he knew or had reason to know of the facts that gave rise to his specific

method-of-execution challenge, in May of 2002. Id.,  *4-5.  The Sixth Circuit reversed, finding

that Cooey's claim accrued upon exhaustion of the state court's direct review of Cooey's

sentence, at which time Cooey would know of his imminent death.  Id. * 8-9.  However, because

Ohio had not adopted lethal injection as a means of execution until 1993, and made it Ohio's sole

method until 2001, the Court adjusted the accrual date accordingly and held that, regardless of

what date was used, Cooey's statute of limitations had accrued and expired before filing suit.  Id.

* 9.  In response to Cooey's assertion, and the district court's finding, that Cooey did not have

actual knowledge of Ohio's protocol until May 2002 when he received the letter described

above, the Sixth Circuit explained:

> Cooey asserts, and the district court found, that Cooey did not have actual
> knowledge of Ohio's protocol until May 2002 when he received responses to his
> inquiries from the Warden.  **Actual knowledge, however, is not the appropriate
> measure; the test is whether he knew or should have known based upon
> reasonable inquiry, and could have filed suit and obtained relief.  Cooey
> should have known of his cause of action in 2001 after amendments to the
> law required that he be executed by lethal injection, and the information was
> publicly available upon request**.  Yet, even if we accepted (and we would not)
> May 2002, the date when he received the Warden's response, Cooey's complaint
> is still untimely.

Id. * 9. [emphasis added].

Another relevant case is that of *Tolbert v. State of Ohio Dept. of Transp.*, 172 F.3d 934,

939 (6th Cir. 1999).  The essence of the claim in *Tolbert* was that ODOT made a racially-based

decision to utilize limited funds to provide sound barriers near a white neighborhood rather than

near a black neighborhood. Id. The Sixth Circuit held that, to the extent that the plaintiff-residents claimed discrimination in the allocation of sound-mitigation measures, their cause of action did not accrue until they knew, or should have known, that ODOT was allocating such resources in an allegedly discriminatory manner. Id. (quoting *Sevier v. Turner,* 742 F.2d 262, 273 (6th Cir.1984) ("A plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence.")).

The plaintiffs in *Tolbert* unsuccessfully argued that they did not become aware of ODOT's plan to construct sound barriers on I-75 (outside the white neighborhood) until they saw such barriers being built in the summer of 1996. Id. Similar to the case herein, plaintiffs there brought causes of action under (1) Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; (2) U.S. Department of Transportation regulations implementing Title VI; (3) The Fair Housing Act, 42 U.S.C. § 3601; (4) The Civil Rights Act of 1870, 42 U.S.C. § 1981; (5) The Civil Rights Act of 1866, 42 U.S.C. § 1982; and (6) The Civil Rights Act of 1871, 42 U.S.C. § 1983. Id. at 937.

The *Tolbert* plaintiffs claimed that, even though there were public hearings held regarding the decision at issue in 1984, their claims did not accrue until 1996 when they actually saw the construction activities commencing. The Sixth Circuit rejected this argument:

> The Cherrywood residents allege that no meeting was held with them before the Parkway EIS was approved. They do not allege, however, that any attempt was made to conceal the public-meeting process from them, or that ODOT did not make reasonable efforts to put them on notice. The Cherrywood residents neither dispute ODOT's assertion that it provided general public notice about at least one of the meetings, nor allege that they could not have discovered, through reasonable diligence, the existence of the Parkway project and of its proximity to Cherrywood.
>
> Instead, they assert that they "did not learn of Parkway construction plans through newspapers, television, fliers, or word of mouth" and that they "had no knowledge that defendants planned to construct the Parkway through their

17

neighborhood until 1996 when construction activities commenced." These allegations are insufficient to toll the statute of limitations. Because any claims arising out of ODOT's preparation and approval of the EIS accrued in 1984, far more than two years before the complaint was filed, such claims are now time-barred.

Id. at 939-40. Under *Tolbert*, the operative date for claims of those Plaintiffs who requested public water service from Muskingum County is when those Plaintiffs knew or should have known that public water service was being provided to a predominately white neighborhood.

Plaintiffs' Complaint alleges two particular instances wherein they claim Muskingum County deliberately or intentionally chose not to provide public water to their neighborhood and chose, instead, to provide water to neighborhoods that were predominately white. First, Plaintiffs claim that, in December 2000, Muskingum County entered into a cooperative agreement with the EMWA to provide water to County residents and, pursuant to that agreement, initiated a series of water projects to extend water lines to overwhelmingly white areas of the County. (Complaint, ¶ 155) [emphasis added]. Further, every Plaintiff answered Interrogatories, under oath, in which they testified that:

> In December 2000, the County entered into a cooperative agreement with the East Muskingum Water Authority to provide water service to County residents. **Pursuant to this agreement, the County initiated a series of water projects to extend water lines to overwhelmingly white areas of the County.** The County did not even study the feasibility of bringing water to the Coal Run/Langan Lane neighborhood despite its knowledge of the pressing need for potable water in the Coal Run/Langan Lane neighborhood.

(See, e.g., Response to Interrogatory No. 12 of Frederick Martin, Appx. p. 215) [emphasis added]. Plaintiffs further allege that, at the time it initiated those projects, the County "knew of the pressing need for running water in the Coal Run/Langan Lane neighborhood" and, despite that knowledge, "deliberately chose to proceed with the scheduled water projects in areas they knew were predominately white." (Complaint, ¶ 155). Under the law of *Cooey* and *Tolbert*,

18

supra, and by Plaintiffs' own admissions, their statute of limitations accrued in December, 2000. This is clearly the date in which Plaintiffs concede knowledge that Muskingum County was allegedly choosing to serve white neighborhoods with public water service instead of the Coal Run/Langan Lane neighborhood.

Second, Plaintiffs claim that, in July 2001, the County authorized preliminary engineering plans for three separate water projects to extend public water service to Adamsville Road, Chandlersville Road, and Gaysport, which are all-white, or nearly all-white, areas. (Complaint, ¶ 157).  Plaintiffs further claim that the County "was aware that residents in these areas were all white or nearly all white, and that they already had access to potable water from wells…[n]otwithstanding this fact, the County chose to provide water to these white areas while intentionally omitting from consideration the Coal Run/Langan Lane neighborhood, with its highly contaminated ground water and predominately African American population. (Complaint, ¶ 157).  A County Resolution dated April 23, 2001 confirms that, on that date, not July 2001, the Muskingum County Commissioners committed funds for all three of the above projects.  (Appx. p. 76).

Defendants submit that, by their own allegations in the Complaint, Plaintiffs' claims accrued in December, 2000, when Muskingum County obtained its first source of water to provide public water service to its residents.  (Complaint, ¶ 155).  If claims did not accrue on this date, they must have accrued on April 23, 2001, wherein Muskingum County Commissioners resolved in a public hearing to commit funds for the Adamsville, Chandlersville, and Gaysport water projects or, at the very latest, July 2001, when Plaintiffs claim the County had authorized engineering for all three of those projects.  (Appx. p. 76; Complaint, ¶ 157).  Pursuant to the law of *Tolbert*, supra, these dates establish the time at which Plaintiffs knew or should have known

that public water service was being provided to a predominately white neighborhood. See *Tolbert v. State of Ohio Dept. of Transp.*, 172 F.3d 934, 939 (6th Cir. 1999).

### C. Claims Are Time-Barred For All Plaintiffs In Group One (Non-Residents).

Group One consists of a group of twenty-seven Plaintiffs who did not live in the Coal Run/Langan Lane neighborhood at the time that any claims could have accrued under Counts One, Two, Three, Four, Five, or Six. (See Exhibit, Appx. p. 2). Whether this Court finds that Plaintiffs' claims accrued in December, 2000 or sometime thereafter, all twenty-seven of the Plaintiffs in Group One did not live in the Coal Run/Langan Lane neighborhood even after December, 2000. Because of their lack of residence, they cannot claim to have suffered damages during the statute of limitations period. Therefore, they do not have a cause of action and must be dismissed from this case.

### D. Claims Are Time-Barred For All Plaintiffs In Group Two (Non-Requesters).

As explained in Section II(C)(2), infra, all but two Plaintiffs in this case never requested public water from Muskingum County. (See Exhibit, Appx. p. 6). Where Plaintiffs never made a request for public water service, they do not have a claim of discrimination or even a claim of a denial of public water service, because Defendants cannot deny a request that was never made. *Alexander v. Local 496, Laborers' Int'l Union,* 177 F.3d 394, 402 (6th Cir.1999); *Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir.1995); *Reynolds v. Quarter Circle Ranch, Inc.* 280 F.Supp.2d 1235, *1241 (D.Colo.,2003) (quoting *Asbury v. Brougham,* 866 F.2d 1276, 1279 (10th Cir.1989)) (See also, legal analysis in Section II, infra).

Muskingum County Defendants submit that, if no request for public water service was ever made, no claim accrues.

**E.      Claims Are Time-Barred For Cynthia Hairston.**

Plaintiff Cynthia Hairston alleges in the Complaint that, when she moved into her home in late 2000, "a Muskingum County official expressly denied her request for water service, stating that she would have to dig a well." (Complaint, ¶ 156). In her deposition, Ms. Hairston testified that it was November, 2000 when she moved into her home. (Cynthia Hairston depo., p. 58.) The date of the claimed rejection begins the running of the applicable statute of limitations period, and, therefore, Cynthia Hairston's claims under Counts Two, Three, Four, Five, and Six are all time-barred.

**F.      The Continuing Violations Doctrine Does Not Apply.**

The Sixth Circuit "rarely extends the continuing violations doctrine to § 1983 actions." *Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003).

The Sixth Circuit has adopted a three-part inquiry for determining whether a continuing violation exists. First, the defendant's wrongful conduct must continue after the precipitating event that began the pattern. Second, injury to the plaintiff must continue to accrue after that event. Finally, further injury to the plaintiffs must have been avoidable if the defendants had at any time ceased their wrongful conduct. See *Kuhnle Brothers, Inc. v. County of Geauga*, 103 F.3d 516, 522 (6th Cir. 1997). Passive inaction does not support a continuing violation theory. *Tolbert v. State of Ohio Dept. of Transp.*, 172 F.3d 934, 940 (6th Cir. 1999). According to *Tolbert*, "[a] continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." (citing *National Advertising Co. v. City of Raleigh*, 947 F.2d 1158, 1166 (4th Cir. 1991)) [emphasis added]. Therefore, any claim by Plaintiffs that they were "denied" water for decades simply because they were not provided water fails under a continued violation argument. In other words, Plaintiffs' claims are those of continual ill effects, not

continual unlawful acts. Further, the Sixth Circuit has previously dealt with alleged discrimination by a municipality with regard to the provision of water services, and held that such denials may be time barred by the statute of limitations, i.e. they are not continuing violations. See, *Middlebrook v. City of Bartlett*, 103 Fed. Appx. 560 (6th Cir. 2004).

In *Tolbert*, plaintiffs claimed that the Ohio Department of Transportation made a racially based decision to utilize limited funds to provide sound barriers near a white neighborhood rather than near a black neighborhood. Id. at 939. In finding no continued violation, the Sixth Circuit held that, in order for there to have been a continuing violation, plaintiffs would have had to have shown a systematic and repeated revisiting to a decision. *Tolbert*, 172 F.3d at 941 (6th Cir. 1999). There is no evidence of any "systematic and repeated revisiting" by Muskingum County regarding any decisions to provide or not provide public water to the Coal Run/Langan Lane neighborhood. After all, Muskingum County did not even have a water source from which to provide public water until December, 2000. Moreover, there is no evidence of Muskingum County even "visiting" the idea of a Coal Run/Langan Lane water project until the fall of 2000, when Commissioner Madden was approached by the City of Zanesville with regard to such a project and the Commissioners agreed to aid in the financing. (Madden Affidavit, ¶ 4, 5, Appx. pp. 4-5).

Finally, the evidence must show evidence of intentional discrimination for the continued violations doctrine to apply. As is explained below, no such evidence exists. The evidence does not support any facts which would trigger the application of the doctrine of continued violations. Therefore, as outlined in the sections above, Plaintiffs' claims are time-barred and should be dismissed.

## II. MUSKINGUM COUNTY DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFFS FAIL TO STATE A CLAIM

Plaintiffs claim that Muskingum County Defendants intentionally discriminated against them because of their race, African American, and the racial composition of their neighborhood. Complaint, ¶¶ 198, 199. In the absence of direct evidence of discrimination, Plaintiffs' claims of race discrimination under Counts One, Two, Three, Five, and Six, are analyzed pursuant to the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817 (1973). See *Middlebrook v. City of Bartlett*, 341 F.Supp.2d 950 (W.D. Tenn. 2003) (*McDonnell Douglas* test applies to claims under The Fair Housing Act, 42 U.S.C § 3601); *Cleveland v. Ibrahim,* 2003 WL 24010953, at *2 (N.D.Ohio May 29, 2003) (applying *McDonnell Douglas* three-part test to §§ 1981, 1982, and 42 U.S.C. 3601-3604); *Canady v. Klaiber*, 2007 WL 81858, *6 (N.D. Ohio 2007) (applying *McDonnell Douglas* test to claims under 42 U.S.C. § 1983); *Paasewe v. Ohio Arts Council*, 2003 WL 22017539 (6th Cir. 2003) (applying *McDonnell-Douglas* test to claims under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d); and *Allen v. Ethicon, Inc.,* 919 F.Supp. 1093, 1098 (S.D.Ohio 1996) (*McDonnell Douglas* test applies to state claims under ORC § 4112.02(H)).

As is first explained below, Plaintiffs have no direct evidence of discrimination. Therefore, this Court must apply the *McDonnell Douglas* test**,** under which Plaintiffs cannot prove a prima facie case of race discrimination. Therefore, Plaintiffs' claims must be dismissed.

### A. Some Plaintiffs Have Membership In A Minority Class.

At the outset, it should be mentioned that Defendants concede that some Plaintiffs claim to have membership in a minority class, as alleged in the Complaint, and Defendants do not challenge those claims for purposes of summary judgment. (See Exhibit, Appx. p. 1). As to the others, Plaintiffs have no evidence of membership in a minority class, and therefore cannot avail

themselves of the protections of the civil rights laws. We move for summary judgment against them on that ground.

### B. There Is No Direct Evidence Of Discrimination.

A plaintiff can show discriminatory purpose through evidence that an official chose to engage in some other action "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *King v. City of Eastpointe*, No. 01-2303, 2003 U.S. App. LEXIS 25712, at * 32-33 (6th Cir. December 4, 2003).

Discovery in this case has confirmed that Plaintiffs have no evidence of discriminatory intent on the part of Muskingum County Defendants. Plaintiff Jerry Kennedy, however, does allege in the Complaint that County Commissioner Dorothy Montgomery denied his request for water, stating there would be no water there "until President Bush drops spiral bombs in the holler" and that Kennedy's "grandchildren's grandchildren would not have water." (Complaint, ¶ 159). As is explained below, even if it were true that this statement was made (it is not), the statement has no racial connotation and does not qualify as County action because only one of three Commissioners allegedly made the statement.

### 1. The Alleged Statement By Dorothy Montgomery Has No Racial Connotation.

The statements alleged to have been said by Dorothy Montgomery do no reference race and, therefore, cannot support any claim by Plaintiffs that the statement establishes discriminatory intent. The Sixth Circuit has held that "direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the [defendant's] actions." *Kocak v. Cmty. Health Partners of Ohio, Inc.* 400 F.3d 466, 470 (6th Cir. 2005). It does not require the fact finder to draw any inferences to reach that conclusion. See *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). Evidence of discrimination

is not considered direct evidence unless a racial motivation is explicitly expressed. *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006) [emphasis added].  Plaintiff Jerry Kennedy's recollection of the statement is as follows:

> A:   And I asked them you went out the Adamsville Road.  You stopped the line at half a mile from Coal Run.  Couldn't you just pick the rest of us up, 30 people up down in the holler.
>
> Q:   What was said?
>
> A:   Well, kind of basically Dorothy Montgomery spoke up and said that the only way – well, she said the finances is really getting tight with us going to war with – and said the only way you guys going to get any water is Bush drop off two spiral bombs."

(Jerry Kennedy depo., p. 99-100).  Even if the Court assumes the statement was made, by Jerry Kennedy's own admission, Commissioner Montgomery's reasoning for why public water would not be brought to his residence was because "finances were really tight."  Moreover, the statement has no racial connotation.  No racial animus may be assumed.

In *Talley v. Bravo Pitino Rest.*, 61 F.3d 1241, 1248-49 (6th Cir. 1995), the Sixth Circuit provided examples of direct evidence of racial animus.  These examples included (1) racial slurs by a manager, (2) a principal stating a "white presence" needed to be maintained, and (3) employee testimony that managers made derogatory racial remarks about blacks.  Id.  The alleged statement in this case has no racial animus and, indeed, has absolutely no reference to race.  Therefore, it is not direct evidence of discrimination and cannot be supporting evidence for discriminatory intent.

    2.    **The Alleged Statements By Commissioner Dorothy Montgomery Do Not Constitute Action Under Color Of State Law.**

The statements which Plaintiffs Jerry Kennedy and Richard Kennedy, Jr. claim were spoken by Commissioner Montgomery may not form a basis upon which to find Muskingum

County liable, as Ms. Montgomery spoke as only one of three County Commissioners. *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 260-263 (6th Cir. 2006). Therefore, Ms. Montgomery's actions cannot constitute the action of Muskingum County. In *Horne v. Russell County Commission*, 379 F. Supp. 2d 1305 (M.D. Ala. E.D. 2005), 2 of 7 county commissioners were alleged to have harassed the county administrator. As regarded her Title VII claims, the plaintiff there argued that the commissioners should not be entitled to a *Faragher* defense because they should be considered the same as owners and employers. Rejecting this argument, the District Court held:

> Although there does not appear to be an Eleventh Circuit case directly on point, there is Eleventh Circuit precedent, discussed above, that the discriminatory motive of a member of a municipal governing body cannot be imputed as a basis for finding the municipality liable. Under the same reasoning, the court concludes that harassment by two members of a seven member Commission does not preclude application of the *Faragher/Ellerth* defense. *See also Mortenson v. City of Oldsmar,* 54 F.Supp.2d 1118 (M.D.Fla.1999) (analyzing application of *Faragher/Ellerth* where harasser was a city council member).

*Horne*, 379 F.Supp.2d 1305, *1328 (M.D.Ala.,2005) [emphasis added]. The Second Circuit has held similarly in *Jeffries v. Harleston,* 52 F.3d 9 (2d Cir.1995), where the court held that defendant, a university board of trustees, could not be held liable under § 1983 where the legitimate motive of a majority of trustees was a "superceding cause" between the tainted motive of two board members and the allegedly retaliatory decision. The Sixth Circuit has held similarly, applying a "but for" test that follows the precedent in *Jeffries*, supra:

> Circuits are split on how to determine if a board, rather than its members, acts with improper motive. The Second, Third, and Ninth Circuits have implied that a board is liable for actions that it would not have taken "but for" members acting with improper motive. *See LaVerdure v. County of Montgomery,* 324 F.3d 123, 125 (3d Cir.2003) (no municipal liability because board voted unanimously and only one member had improper motive); *Jeffries v. Harleston,* 52 F.3d 9, 14 (2d Cir.1995) ("[T]he nine votes based on legitimate grounds constitute a superseding cause breaking the causal chain between the tainted motives...and the decision");

> *Kawaoka v. City of Arroyo Grande,* 17 F.3d 1227, 1239 (9th Cir.1994) (no municipal liability because board acted unanimously and only one member had improper motive). Thus, where improperly motivated members supply the deciding margin, the board itself is liable.
>
> We decline to follow the approach suggested by Scarbrough from *Scott-Harris v. City of Fall River,* 134 F.3d 427, 437 (1st Cir.1997), rev'd on other grounds *sub nom. Bogan v. Scott-Harris,* 523 U.S. 44, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998). In that case, board liability only existed where the plaintiff established both: "(a) bad motive on the part of at least a significant block of legislators, and (b) circumstances suggesting the probable complicity of others." *Id.* That approach would be difficult to apply, because it leaves many questions unanswered. Among the most important of these is what constitutes a "significant bloc of legislators" or "circumstances suggesting the probable complicity of others."
>
> The "but for" approach from the Second, Third and Ninth Circuit cases is more in accord with the decision from *Mt. Healthy.* In that case, the Court set up a burden-shifting regime in which a key question was whether a board would have acted the same way, absent improper motive.
>
> Applying the "but for" approach here, Scarbrough has submitted enough evidence to hold the Board itself liable. He has submitted evidence showing Lively, Strand and Spurling voted with improper motivation. The Board would not have taken the action it did were it not for their votes. Thus, the Board is not entitled to summary judgment on this issue.

*Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, *262 -263 (6th Cir. 2006). The minutes from the meeting of December 13, 2001 do not reflect, any decisions having been made to not provide water to the Coal Run/Langan Lane neighborhood at the meeting where Commissioner Montgomery's alleged statement was made. (See Minutes, Appx. p. 61). Individuals in attendance confirm the same. (Id). Finally, the evidence shows that the County provided water within 25 months of that meeting. Therefore, Plaintiffs' allegation fails the "but for" test, and Commissioner Montgomery's alleged statement may not be imputed against the County and her Board of Commissioners.

### C. Plaintiffs Cannot Establish A Prima Facie Case Of Discrimination.

*McDonnell Douglas* and its progeny set forth a tripartite scheme of proof in discrimination cases. Because Plaintiffs do not have credible, direct evidence of discriminatory intent, Plaintiffs must present circumstantial evidence to prove a prima facie case, enough to create a presumption of discrimination. *Alexander v. Local 496, Laborers' Int'l Union,* 177 F.3d 394, 402 (6th Cir.1999). Although *McDonnell Douglas* involved claims of race discrimination in the employment setting, the tripartite framework established in that case is a flexible standard that is modified to particular factual situations. *Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir.1995). The claims asserted by Plaintiffs herein are far more analogous to housing discrimination cases than to employment cases. To prove a prima facie case in housing discrimination cases, plaintiffs must prove the following elements:

> 1) they are members of a protected class;

> 2) they submitted adequate plans for approval;

> 3) their application was rejected; and

> 4) other similarly situated applicants were treated more favorably.

*Reynolds v. Quarter Circle Ranch, Inc.* 280 F.Supp.2d 1235, *1241 (D.Colo.,2003) (quoting *Asbury v. Brougham,* 866 F.2d 1276, 1279 (10th Cir.1989)). Defendants submit that Plaintiffs herein must prove, then, the following elements for a prima facie case of race discrimination with regard to the provision of public water:

> 1) they are members of a protected class;

> 2) they submitted a request/application for public water service;

> 3) their application/request was rejected; and

> 4) other similarly situated applicants were treated more favorably.

Plaintiffs cannot prove a prima facie case here.  First, not all Plaintiffs are members of a protected class.  Second, only two Plaintiffs claim to have requested public water service from Muskingum County Defendants, and the remaining Plaintiffs admitted in their depositions that they did not request public water service from these Defendants.  Third, as to those Plaintiffs that never requested public water service, there is no rejection of a request.  As to those two Plaintiffs who did request public water service, they were given water service within 25 months of their request and cannot prove a rejection.  Fourth, Plaintiffs cannot prove that they were treated differently from similarly situated applicants.

### 1.    Membership In A Protected Class.

There are eleven Plaintiffs who admit that their race is "white."[8]  Therefore, these Plaintiffs are not members of a protected class and cannot meet the first test under *McDonnell Douglas*.

### 2.    Requests For Public Water Service Were Not Made.

All but two of the  Plaintiffs here have  not taken <u>any action</u> to satisfy the second requirement to a prima facie test,  making a request  for public water  to Muskingum County. Depositions were taken of all Plaintiffs in this case, and all but two Plaintiffs[9] admitted that they have  never  requested  water  from  Muskingum  County.    (See Exhibit, Appx. p. 6).  Donald Kennedy, one of the Plaintiffs who admitted to never having made a request for public water, who  does not live in the Coal/Run Langan Lane neighborhood, and has not lived there since 1967, responded as follows with regard to why he is a Plaintiff in this lawsuit:

---

[8]  Those Plaintiffs who have indicated their race is "white" in the Fourth Amended Complaint are Donald Kennedy, ¶ 29; Jeanene Kennedy, ¶ 31; Marsha Kennedy, ¶ 35; Nancy Kennedy, ¶ 40; Shawn Kennedy, ¶ 46; Bryan Newman, ¶ 63; Goldie Newman, ¶ 64; Judy Newman, ¶ 65; Baranda Paynter, ¶ 68; Tammy Scott, ¶ 69; and Erin Walker, ¶ 74.

[9]  Plaintiffs Jerry Kennedy and Richard Kennedy, Jr. claim to have made requests to Muskingum County.

Q:      Other than talking to counsel, how did you get involved in this lawsuit?

A:      Through the family, you know, and we lived in the neighborhood.

Q:      Did neighbors or family members suggest to you that you join the lawsuit?

A:      Well, everybody was involved in it so I figured I might as well get involved in it, too, and see what we could do and get the water stuff going.

Q:      The purpose of you joining the lawsuit was to try to help your family and friends get water?

A:      Yeah, sure.  They deserve it.

(Donald Kennedy depo., p. 66.)

Fifty-seven Plaintiffs gave an absolute "no" in their deposition to the question of whether they had ever requested public water service from Muskingum County.  (See Exhibit, Appx. p. 6).  A brief analysis of the deposition testimony of all remaining Plaintiffs, other than Richard Kennedy, Jr. and Jerry Kennedy, indicates that they too did not request public water service from Muskingum County:

<u>Bryan Newman</u>

Bryan Newman indicated in his deposition that he had never personally requested public water service, but that his mother had requested it for his residence.  (Bryan Newman depo., p. 15).  However, when Mrs. Newman was deposed, she indicated that she had not made requests to Muskingum County; she had contacted Mr. Pletcher, the City of Zanesville's Water Superintendent, regarding whether water service could be provided for her son's residence.  (Judy Newman depo., pp. 30-31).

<u>Bernard Kennedy</u>

Bernard Kennedy testified that he has twice signed petitions for what he believed was a request for public water service.  (Bernard Kennedy depo., p. 31).  However, Mr. Kennedy does

not know who circulated the petition or to whom or what entity the petition was to be delivered. (Bernard Kennedy depo., pp. 32-33).

### Jeanene Kennedy

Jeanene Kennedy testified that she "signed a clipboard" on two occasions and that she also paid money for a deposit for public water service.  She does not know who circulated the clipboard or to whom she paid a deposit.  (Jeanene Kennedy depo., pp. 11-13).  Jeanene Kennedy also testified that she attended to meetings at the Washington Township Fire Department where the topic of public water service was requested.  (Id., pp. 21-22).  She does not know who was in charge of those meetings.  (Id).

### Marcus Kennedy

Marcus Kennedy testified that he has gone to the City of Zanesville water works to discuss public water service and that he has "dropped a petition off" at the Washington Township Fire Department.  (Marcus Kennedy depo., pp. 24-26; 31).  Although Mr. Kennedy stated that he wrote "to the county" on the petition, he did not deliver it to Muskingum County government offices, he dropped it off at the Washington Township Fire Department to someone he did not know.  (Id).  Mr. Kennedy admits he has never spoken with anyone from Muskingum County regarding this.  (Id., p. 34).

### Marvin Kennedy, Sr.

Marvin Kennedy, Sr. testified that he once went to a Muskingum County meeting where the topic was the provision of public water service, but this was a meeting held after the decision was already made to bring water to the Coal Run area.  (Marvin Kennedy, Sr. depo., p. 48). Therefore, this does not constitute an actionable "request" for public water service.

<u>Audrey Ford</u>

Audrey Ford learned sometime around October, 2002, before she moved into her residence on Coal Run Road, that the area did not have public water.  (Audrey Ford depo., p. 13). Ms. Ford contacted the City of Zanesville to have her water transferred from where she was living in the City, and learned at that time there was no water service at her new address.  (Id., pp. 16-17).  Ms. Ford and her husband discussed the idea of getting a well for water.  (Id. p. 17). Ms. Ford later called Red Howard, a Muskingum County employee (although she refers to him in her deposition as a city official), and received further confirmation that there was no water at her address.  (Id., pp. 17-18).  Ms. Ford admits that she called Mr. Howard, asked him if there was water out on Coal Run Road, and when Mr. Howard told her "no," she just hung up the phone without allowing Mr. Howard to provide any explanation, or to arguably share with Ms. Ford how she would go about requesting water service:

Q:  When would you have spoke to Mr. Howard?

A:  It had to have been the end of 2002 possibly, probably.  It might have been 2003. I'm not sure.

Q:  This would have been after your house would have been completed and you and your husband had moved in?

A:  Yes.

Q:  And what do you recollect as far as that vague conversation you had with Mr. Howard?

A:  Just that there was no water.

\*                  \*                  \*

Q:  All right.  So what did you two discuss, other than the fact that you said there is no water?

A:  I just kind of hung up.

32

Q:      How long did your conversation last?

A:      Not very long.

Q:      What was said during the conversation?

A:      I just asked, "could you get water out on Coal Run Road?" And I was told, "No."
        That's it.  And I just hung up the phone.

Q:      Well, the answer that was provided by Mr. Howard was simply no?

A:      Uh-huh.

Q:      And that's it, no explanation?

A:      That's all I remember.  No, I didn't wait for an explanation, I hung up.

(Id., pp. 18-19).  This cannot constitute a "request" for public water service.  By her own

testimony, Ms. Ford did not even provide Mr. Howard with an address for where she lived, or

her name.  (Id)  Moreover, Mr. Howard never even had a chance to tell Ms. Ford that she could

submit a petition for water service had she desired to, because as soon as he told Ms. Ford that

there was no public water service at Coal Run Road, Ms. Ford hung up on him.  (Id).

<u>Cynthia and Lynn Hairston</u>

        Plaintiff Cynthia Hairston claims, at paragraph 156 of the Complaint, that, in the year

2000, a Muskingum County official "expressly denied" her request for water service.  The

deposition testimony of Cynthia Hairston and her husband, Lynn Hairston, clarifies that the

Hairstons were not making a request for public water service, but were at the County Health

Department asking how they were supposed to get water safely to their Coal Run home.  Mr.

Hairston testified as follows:

Q:      What was the specific reason for going to the health department?

A:      Just about the water.  We wanted to figure out, you know, the water source, how
        would we – what to do about getting water is why we went there in the first place.

        \*        \*        \*        \*        \*

Q:     What happened then when you went to the health department to see what you needed to do to get water to your house?

A:     Well, we were told that if we wanted to move there, we would have to dig a well. We would have to dig a well and then get the water tested to make sure that it's even usable.

(Lynn Hairston depo. pp. 19-20).  Likewise, Cynthia Hairston testified that she called the Health Department to see if they could drill a well at their new residence.  (Cynthia Hairston depo., p. 35).  She had decided to drill a well (as opposed to tapping into a water line) because it was more cost effective.  (Cynthia Hairston depo., p. 36-37).  Her testimony was:

A:     Because our options were to – the only two options that we had was to dig a well or attach to the existing lines that was over a thousand feet away.

Q:     How did you find out that those were your options?

A:     It's a – our land is family land, so it's been there a long – y0ou know, I've known about it all of our lives.  And I knew the neighbor had city water, and when I spoke to father about getting it, it was attach to the city or dig a well.  And cost effectively, it was for the well.

(Cynthia Hairston depo., p. 49).   Ms. Hairston was asked why she contacted the health department:

Q:     Tell me specifically what brought you to contact the health department regarding water at your 1800 Coal Run address.

(Counsel for Plaintiff objects on the basis of "asked and answered").

Q:     You can answer.

A:     When we decided to put the house there in that area, we needed water.  And it was more cost effective to put the well in.

Q:     Why did you contact the health department specifically?  I'm curious why it was the health department that you called.

(Counsel for Plaintiff objects again for "asked and answered").

A:      Somebody told us, and I can't remember who.

    *  *  *

A:      Somebody said something about you just can't dig a well, you have to have a permit, I guess.  Or you have to be inspected to see if they can dig a well.  I'm not for sure.

(Cynthia Hairston depo., pp. 161).  By her own admission, Cynthia Hairston had already made the decision, before she contacted the Health Department, that she was going to drill a well because it was the most cost-effective thing to do.  She contacted the Health Department because somebody told her that she could not dig a well without a permit.  No request was made for public water service.

<u>Richard Kennedy, Jr. and Jerry Kennedy</u>

Plaintiffs Richard Kennedy, Jr. and Jerry Kennedy have both alleged that they made a request for public water service to Muskingum County.   (Complaint, ¶ 158).  Muskingum County Defendants concede that on December 13, 2001, both individuals did come to a Chandlersville public hearing and did ask about providing water to the Coal Run/Langan Lane area.  These Defendants concede only, then, that Richard Kennedy, Jr. and Jerry Kennedy can meet the second element of a prima facie case.  However, as is explained below, Richard Kennedy, Jr. and Jerry Kennedy's requests for public water were not denied, as they were provided public water service within 25 months of their first request.

**3.**  **No Requests For Public Water Service Were Denied.**

Sixty-seven Plaintiffs never made a request for public water service to Muskingum County.  Therefore, sixty-seven Plaintiffs do not have a claim that they were ever denied water service by Muskingum County, and their claims fail as a matter of law.  See *Paschal v. Flagstar Bank*, 295 F.3d 565, 572 (6th Cir. 2002) (See also, Section II(C), supra – Plaintiffs must prove

that they submitted a request/application for public water service in order to meet a prima facie test under *McDonnell Douglas*).

With regard to Jerry Kennedy and Richard Kennedy Jr., the two Plaintiffs who did ask for public water service, those individuals were provided public water service within just 25 months of their first request on December 13, 2001. Therefore, their request for public water service was never denied.

### 4. Plaintiffs Were Treated No Differently Than Other Similarly Situated Applicants Of An Unprotected Class.

Based upon the allegations set forth in their Complaint, Plaintiffs argue that Muskingum County Defendants treated them differently than two groups of "similarly situated" applicants of an unprotected class. The first group is made up of those individuals who lived on the northern portion of Langan Lane and had public water going back to the early 1950's. Complaint, ¶ 92. The second group is made up of those individuals residing in the Adamsville, Gaysport, and Chandlersville areas. (Complaint, ¶ 157). The undisputed evidence, however, shows that Plaintiffs were not treated differently by the County than other similarly situated applicants of an unprotected class.

### a. There is no relationship between water line locations and racial demographics in Muskingum County.

Jim Wyles, a Research Associate Senior Graphic Information System Specialist Project Manager with the Northern Ohio Data and Information Service ("NODIS") department at the Cleveland State University College of Urban Affairs, was retained to create GIS mapping of Muskingum County outlining a history of water pipe installation along with data overlays

indicating African American population.[10]  (Wyles depo., p. 6, 9, 30-31).  Mr. Wyles was asked, based upon his study, to determine whether there was any relationship between demographics and the location of water lines in Muskingum County.  (Wyles depo., p. 143).  Mr. Wyles compared the location of water lines run throughout Muskingum County to the population of African Americans throughout the County, based upon census data, and concluded that there is no relationship between water line locations and racial demographics in Muskingum County. (Wyles depo, p. 8).

### b.  Residents Living On The Northern Portion Of Langan Lane.

With regard to the first group, those individuals who received public water while living on the northern portion of Langan Lane, Plaintiffs' Complaint concedes that Muskingum County Defendants were not responsible for providing water to those individuals.  (See Complaint, ¶¶ 92-94).  As is explained in the Statement of Facts, supra, the individuals who laid the water line on the northern portion of Langan Lane had formed a private group and used their own money to do so.  (Michel depo., p. 52-55, 131).  Muskingum County had no involvement.  (Michel depo., p. 28).  Therefore, Plaintiffs cannot argue that Muskingum County Defendants somehow treated them differently than those who had water on the northern portion of Langan Lane.

### c.  Adamsville, Chandlersville, and Gaysport Areas.

Defendants concede that the second group mentioned by Plaintiffs, those individuals living in the Adamsville, Gaysport, and Chandlersville areas where water projects were completed, is populated by residents that are predominately white.  However, Plaintiffs were not treated differently than those living in these areas.  As explained in the Statement of Facts, above, these first three projects completed by Muskingum County were chosen because of the

---

[10] Defendants' Rule 26(a)(2) disclosures, including all eleven color maps created by Mr. Wyles and referred to in his report, are available at Appx. p. 19.

history of petitions received from these areas as well as their great need for public water service. Residents in the Coal Run/Langan Lane neighborhood had never petitioned Muskingum County for public water service.

Examples of the extensive petitioning and documentation of need for public water service in the Gaysport, Adamsville, and Chandlersville areas follows.

### Adamsville

Individuals in the Adamsville Road area had been persistent in their petitioning for public water service over the years. On January 23, 1990, over 150 individuals signed a petition to the East Muskingum Water Authority for water service, but never received it. (Appx. p. 180). Another petition was submitted again in 1994 with 185 signatures. (Appx. p. 192). Petitions were even given to the Ohio Department of Natural Resources due to the poor quality of water in the area. (Appx. p. 73).

### Chandlersville

On February 8, 2001, the President and CEO of "the Wilds" Board of Governing Trustees wrote to Commissioner Don Madden regarding their interest and need in bringing water to the Chandlersville area which would bring a source of water close to their park. (Appx. p. 179). On May 25, 2001, the Zanesville-Muskingum County Health Department wrote to Commissioner Don Madden regarding the need for public water in Chandlersville. (Appx. p. 177). The Health Department noted the fact that wells in that area were unfit for human consumption, and that these unsafe wells had been used by families in the area for years. (Id). The Health Department expressed "strong support" for a water line extension to provide a safe and reliable source of drinking water to the Chandlersville area. (Id. See also, Appx. p. 60, regarding testing of the poor water quality in the area).

38

<u>Gaysport</u>

Residents of the Gaysport area had petitioned Muskingum County for water even before Muskingum County had a source to provide water and years before Jerry Kennedy and Richard Kennedy, Jr. brought up the issue at a County meeting in December of 2001.  In 1998, 169 individuals from the Gaysport area submitted a petition to then County Commissioner Ed Kenily. (Appx. p. 63).

Muskingum County gave preference to the above three projects because of their need for water and the fact that so many residents from the areas had persistently petitioned over the years.  Plaintiffs had not.  Plaintiffs, therefore, cannot claim that they are somehow similarly situated to those residents living in the above three areas.  Plaintiffs are more similarly situated to all other county residents who had not petitioned for public water service and still to this day to not have public water.  (Madden Aff. ¶¶ 11-13, Appx. pp. 10-11).  The County simply cannot provide water service to everyone at once.

### d.    Other Neighborhoods Near The City Limits.

Finally, based upon the discovery in this case, it appears that Plaintiffs will argue that they were treated differently than white neighborhoods because they were uniquely close to the City of Zanesville's water tower (albeit, outside the City of Zanesville limits) and did not have public water.  Such an argument fails.

It is unfortunate that not everyone in Muskingum County is set up for public water service, but the fact is that there are several predominately white neighborhoods within a mile from the City of Zanesville's water tower that still today do not have public water service. Examples include Riverview, Riverview Manor, and Hale Road.  (Madden Affidavit, ¶ 12, Appx. p. 11).  All of these areas are nearly all-white.  (Id.).  As is detailed in the Affidavit of

Beth Curtis, at Appx. p. 12, Ms. Curtis and her husband live in an area of about 12 homes on Hale Road, just outside the City of Zanesville limits, that have never been provided public water service. (Curtis Affidavit, ¶ 2, 5, Appx. p. 12). The area is nearly all-white. (Curtis Affidavit, ¶ 3, Appx. p. 12). Because her household and those around her did not have public water, the Curtis family, which is a white household, was forced to lay their own water line (and pay for it) nearly one mile to an available water source. (Curtis Affidavit, ¶ 6, Appx. p. 13). To do so cost her family $26,250.00. (Curtis Affidavit, ¶ 7, Appx. p. 13).

   **D.    Plaintiffs Have No Evidence Of Discriminatory Conduct By County Defendants.**

Before any residents of the Coal Run/Langan Lane neighborhood ever made a request for public water, Muskingum County Commissioners considered a Coal Run/Langan Lane project proposed to them by the City of Zanesville and agreed to assist the City of Zanesville with financing of water lines in the Coal Run/Langan Lane area. (Madden Affidavit, ¶ 4, 5, Appx. pp. 9-10).

The first request ever made to Muskingum County by residents of the Coal Run/Langan Lane neighborhood for public water service to be brought to them was on December 13, 2001, at a public hearing to discuss the Chandlersville water project. (Affidavit of Commissioners, Appx. p. 57). Only two residents from the entire neighborhood, Jerry Kennedy and Richard Kennedy, Jr., were present. (Sign In Sheet, Appx. 43). The only reason that the two men had even gone to the meeting was because their friend, Joyce Hill, told them to. (Joyce Hill depo., pp. 73-74). In either 1999 or 2000, Joyce Hill told Jerry Kennedy and Richard Kennedy, Jr. that filing a lawsuit or a complaint with the Ohio Civil Rights Commission was an option, and the men had indicated that they were interested in doing so. (Joyce Hill depo., p. 82; 167; 181). In her experience with

fair housing laws, Joyce Hill knew that a typical fair housing complaint requirement was to have a recent "denial of services." (Joyce Hill depo., p. 168).

The reality is, however, that Muskingum County did not deny Jerry Kennedy and Richard Kennedy, Jr.'s request for public water service. In fact, within only 25 months of the date of their request, the entire Coal Run/Langan Lane neighborhood was set up with public water, to the exclusions of Gorsuch Road, Cutler Road, Dillon Deerwood, Ballard Road, Adamsville, Spry Road, Clay Pike, Osborn Road, Kingsview, Virginia Road, and the replacement of the Jersey Ridge pump station projects, all water projects in predominately white areas of the County which are still waiting. (Madden Affidavit, ¶ 13, Appx. p. 11). Plaintiffs' claims should be denied.

### E.    The County Has A Legitimate, Non-Discriminatory Reason For Its Actions.

If this Court somehow finds that Plaintiffs have established a prima facie case of discrimination, the burden shifts to Defendants to establish a legitimate, nondiscriminatory reason for the action. If this burden is met, the burden again shifts to the Plaintiffs to establish that the Defendants' reason is mere pretext. *Plant v. Morton Int'l, Inc.,* 212 F.3d 929, 936 (6th Cir.2000); *Kocsis v. Multi-Care Mgmt., Inc.,* 97 F.3d 876, 882-83 (6th Cir.1996).

As is explained above, Muskingum County was first presented with the idea of a Coal Run/Langan Lane water project in the fall of 2000, when the City of Zanesville asked the County to assist in the financing of the project. The County agreed to assist in the financing. (Madden Affidavit ¶ 5, Appx. p. 10). However, after a $2 million project was proposed, the Commissioners determined that they would not debt-service such a great amount on the residence of Coal Run. (Madden Affidavit ¶ 8, Appx. p. 10). Instead, the County waited until the EMWA completed its project along Pleasant Grove Road. Once the Pleasant Grove Project was completed, the County had a close and available source of water to construct the Coal Run

water project and did so.  (Madden Affidavit ¶ 10, Appx. p. 10).  The Plaintiffs today all have

access to public water service that was provided to them by Muskingum County.

## III.    PLAINTIFFS WHO HAD PUBLIC WATER SERVICE DO NOT HAVE A CLAIM AGAINST THESE DEFENDANTS

Three of the individuals who bring this lawsuit admitted in their depositions that they

actually did have public water service.  Therefore, these three Plaintiffs have no claim.  The three

Plaintiffs who did have public water service during the relevant time at issue in this case are Judy

Newman, Goldie Newman, and Mary Kennedy.

Paragraph 127 of Plaintiffs' Complaint alleges:

"Plaintiffs Judy Newman and Goldie Newman have lived at 1805 Coal Run Road
for approximately 30 years.  Because Judy Newman and Goldie Newman did not
have public water service, they were forced to purchase large quantities of water
from the City, and haul the water, or have it hauled, to their home…"

(Complaint, ¶ 127).  However, in their depositions, the Newmans admitted that they did have

public water service and had since 1973.  (Judy Newman depo., p. 24; Goldie Newman depo. pp.

17-18).  Plaintiff Mary Kennedy, who lives at 1740 Adamsville Road, has had public water

service since she moved into that address in the year 1987.  (Mary Kennedy depo., p. 13).

Because these three Plaintiffs had public water service during the entire actionable time

period, as outlined in Section II, above, they do not have a cause of action against Defendants

and their claims must be dismissed.

## IV.    DEFENDANT COMMISSIONERS DON MADDEN, ED KENILY, AND DOROTHY MONTGOMERY ARE QUALIFIEDLY IMMUNE

Even if this Court were to determine that Plaintiffs somehow have a claim against

Muskingum County, the individual commissioners are entitled to the defense of qualified

immunity.  This defense shields government officials performing discretionary functions from

civil damages as long as their conduct does not violate "clearly established statutory or

constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).[11]  While the defendant bears the burden of pleading the defense of qualified immunity, the ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity.  *Miller v. Administrative Office of Courts,* 448 F.3d 887, 894 (6th Cir.2006), *citing Silberstein v. City of Dayton,* 440 F.3d 306, 311 (6th Cir.2006).

In a qualified immunity analysis, the "first inquiry must be whether a constitutional right would have been violated on the facts alleged; second, assuming the violation is established, the question whether the right was clearly established must be considered on a more specific level." *Estate of William J. Bing v. City of Whitehall*, 456 F. 3d 555, 569 (6th Cir. 2006) (quoting *Saucier v. Katz,* 533 U.S. 194, 200 (2001)).  In determining whether or not such a right is clearly established, the Sixth Circuit first looks to Supreme Court cases, then to Sixth Circuit cases, and finally to decisions of other circuits.  *Id.* at 570.  If the Defendants' actions fall near enough to the "hazy" border separating illegal from legal conduct, then qualified immunity attaches.  *Id.*

Plaintiffs can come forward with no case law from the United States Supreme Court, the Sixth Circuit, or this Court that would have put Don Madden, Ed Kenily, or Dorothy Montgomery on notice that any of their actions were unconstitutional.  No case holds that individuals have a constitutional right to public water service.  The evidence demonstrates that, once it acquired a source from which to provide water, the first three groups to receive water from Muskingum County were those who had expressed a significant interest through letters,

---

[11] Pointedly, the Supreme Court has held that this is an immunity from suit rather than a mere defense to liability, and is effectively lost if a case is erroneously permitted to go to trial. *Mitchell v. Forsyth*, 472 U.S. 511 (1985).  Accordingly, the Federal Courts hold that the District Court should address a governmental defendant's claim of Qualified Immunity at the earliest possible stage in the litigation, and hold that a governmental defendant is entitled to an immediate appeal of a District Court's denial of Qualified Immunity to the Sixth Circuit.  See *Crawford v. Britton*, 118 S.Ct. 1584 (1998); *Behrens v. Pelleiter*, 116 S.Ct. 834 (1996); *Kennedy v. City of Cleveland,* 797 F.2d at 298, 299 (6th Cir. 1986), *cert denied*, 479 U.S. 1103 (1987).

petitions, and other requests. Individuals in the Adamsville Road area petitioned numerous times for public water service as early as 1990, and petitions identify 185 signatures making a request. (Appx. p. 192). Even the Ohio Department of Natural Resources recommended the project be completed due to the poor quality of water in the area. (Appx. p. 73). Requests were made for the Chandlersville project from the President and CEO of "the Wilds" Board of Governing Trustees and the Zanesville-Muskingum County Health Department due to, among other things, unsafe wells in the area. (Appx. p. 177, 179). As early as in 1998, 169 individuals from the Gaysport area submitted a petition to then County Commissioner Ed Kenily. (Appx. p. 63).

The Board of Commissioners received no petitions, letters, or correspondence for water service from residents of the Coal Run/Langan Lane area until December 13, 2001, at a County hearing for one of the first three water projects. (Affidavit of Commissioners, Appx. p. 57). Even though the Coal Run/Langan Lane citizens had not formally petitioned the County for water, the County surveyed the area for interest by September 2002 and water lines were laid by December 2003.

It was reasonable and constitutional for the Commissioners to place a preference on the order of county water projects based upon the number and extent of requests for a particular project. For these reasons, and all of those reasons explained herein, Plaintiffs simply cannot meet their burden of proving that Don Madden, Ed Kenily, and Dorothy Montgomery are not entitled to qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

## V. PLAINTIFFS ARE BARRED FROM RECOVERING PUNITIVE DAMAGES AGAINST MUSKINGUM COUNTY

The United States Supreme Court has ruled punitive damages cannot be recovered against municipalities, even in § 1983 actions. *City of Newport v. Fact Concerts*, 453 U.S. 247, 271 (1981) and *Monell v Dept. of Social Services*, 436 U.S.658 (1978). For non-constitutional

claims, Ohio law bars recovery of punitive damages against political subdivisions of the State. O.R.C. 2744.09(E); O.R.C. 2744.05.  Defendant Muskingum County is a political subdivision of the State of Ohio as defined in O.R.C. 2744.01(F).  Therefore, Plaintiffs may not be awarded punitive damages against Defendant Muskingum County, Ohio.

## VI.    PLAINTIFFS' PRAYER FOR INJUNCTIVE RELIEF IS MOOT AND PLAINTIFFS HAVE NO STANDING TO ASSERT A CLAIM FOR INJUNCTIVE RELIEF

There should be no dispute by Plaintiffs that water service was extended to the Coal Run/Langan Lane neighborhood by January 2004.  No other allegations of alleged discrimination are present in the Complaint.  Plaintiffs have no remaining case or controversy with these Defendants that would justify the equitable relief sought.  Standing to seek injunctive relief depends on the likelihood of future injury to the Plaintiff.  *City of Los Angeles v. Lyons*, 461 US 95 at 107-109 (1983).  Absent a showing of continuing irreparable injury and a lack of adequate remedy at law, which Plaintiffs do not allege here, injunctive relief is not available.  *Kallstrom v. City of Columbus*, 136 F. 3d 1055, 1068 (6th Cir. 1998).

## VII.   PLAINTIFFS FAIR HOUSING ADVOCATES ASSOCIATION AND THE OHIO CIVIL RIGHTS COMMISSION SHOULD BE DISMISSED

Plaintiffs Fair Housing Advocates Association and The Ohio Civil Rights Commission claim injury as a result of their time and resources expended in investigating and addressing alleged discriminatory practices of Defendants.  (Doc. 114, ¶ 177; Doc. 50, Prayer for Relief).  These claims, and the injuries alleged, are based upon claims that Defendants discriminated against Plaintiffs herein.  For the reasons expressed above, Plaintiffs fail to state a claim of discrimination, and, therefore, claims of Plaintiffs Fair Housing Advocates Association and The Ohio Civil Rights Commission should also be dismissed.

## VIII.   MUSKINGUM COUNTY DEFENDANTS ARE IMMUNE FROM STATE CLAIMS

As a political subdivision, Muskingum County is immune from Plaintiffs' state claims. O.R.C. 2744.02(A). The Ohio Supreme Court has determined this immunity is constitutionally sound in challenges on both due process and equal protection grounds under both the Ohio and United States Constitution. *Fabrey v. McDonald Village Police Dept*., 70 Ohio St. 3d 351, 639 NE 2d 31 (1994). This immunity applies to intentional acts as well as discrimination claims under Ohio law. *Coleman v. Cleveland School District Board Of Education*, 2004 Ohio 5854 (8th Dist., 2004),

<u>CONCLUSION</u>

For all of the foregoing reasons, no genuine issue of material fact exists with respect to the issues raised in Plaintiffs' Fourth Amended Complaint (Doc. 114) or the Complaint of Joined Plaintiff the Ohio Civil Rights Commission (Doc. 50) and Defendants are entitled to judgment as a matter of law.

Respectfully submitted,

/s/ _Mark Landes_____
Mark Landes, Trial Counsel      (0027227)
marklandes@isaacbrant.com
Jessica K. Philemond      (0076761)
jkp@isaacbrant.com
Isaac, Brant, Ledman & Teetor, LLP
250 East Broad Street
Columbus, Ohio  43215
(614) 221-2121; Fax (614) 365-9516
*Attorneys for Muskingum County, Ohio,*
*Ed Kenily, Don Madden, and Dorothy*
*Montgomery*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 14, 2007 a copy of the foregoing  was filed electronically.

Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.


/s/ _Mark Landes_____ _____
Isaac, Brant, Ledman, & Teetor LLP