**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **JERRY R. KENNEDY, et al.,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| v. | : | **Case No. 2:03-cv-1047** |
| | : | |
| **CITY OF ZANESVILLE, OHIO, et al.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **Defendants.** | : | |

## OPINION

## I.  INTRODUCTION

This matter comes before the Court on the following motions for summary judgment: (1) Motion for Summary Judgment of Defendant City of Zanesville ("City"); (2) Motion for Summary Judgment of Defendants Washington Township, Clint W. Cameron, Paul R. Bunting and Douglas Culbertson ("Township Defendants"); (3) Motion for Summary Judgment of Defendants Muskingum County, Don Madden, Ed Kenily, and Dorothy Montgomery ("County Defendants"); and (4) Plaintiffs' Motion for Partial Summary Judgment on the Liability of Muskingum County for the East Muskingum Water Authority.  After thorough review, this Court **GRANTS** Plaintiffs' Motion for Partial Summary Judgment; **GRANTS** the Township Defendants' Motion for Summary Judgment; and **GRANTS in part and DENIES in part** the City's and County Defendants' Motions for Summary Judgment.

## II.  BACKGROUND

Sixty-eight individual plaintiffs, the Fair Housing Advocates Association ("FHAA"), and

1

the Ohio Civil Rights Commission ("OCRC") (collectively, "Plaintiffs"), filed this civil rights action against the City of Zanesville ("City"), Muskingum County ("County"), Washington Township ("Township") and individual elected officials from the County and Township, (collectively, "Defendants"). Plaintiffs claim that Defendants' had a policy, pattern, and practice of denying public water service to the individual Plaintiffs during the last fifty years because they are African-American and/or because they reside in a predominantly African-American neighborhood.

The individual Plaintiffs lived, at various times, in the Coal Run neighborhood located within the County and Township, and just outside the Zanesville city limits. The neighborhood includes approximately twenty-five homes, and historically the residents of Coal Run have been African-American. Currently, approximately eighty-five percent of the Coal Run neighborhood residents are African-American, while the County and Township both are over ninety-five percent white. Contaminated by years of mining in the area, the ground water in the Coal Run neighborhood is not safe for residential purposes. Prior to receiving public water service in 2004, Plaintiffs, therefore, used wells, hauled water, had water delivered to their homes, and even collected rain water and melted snow in order to have safe, usable water for drinking, cooking, and bathing.

Because the factual allegations beyond this basic background diverge, the Court will set forth the facts as separately presented by Plaintiffs and Defendants.

### A. The Facts Presented by Plaintiffs

According to Plaintiffs, the residents of Coal Run suffered under a decades-long discriminatory government policy of refusing to provide clean water to their neighborhood due to its racial makeup. Plaintiffs claim that Coal Run was surrounded by waterlines going to predominately white areas and Plaintiffs, despite repeated requests, were not permitted to connect

to the adjacent lines. Plaintiffs contend that the City, County, and Township are all responsible for the waterlines that run through the County, and even though Defendants had the power and ability to bring water to Coal Run, they engaged in three broad forms of discrimination to deny the neighborhood water. First, Plaintiffs claim that Defendants regularly passed over the Coal Run neighborhood in favor of funding and constructing waterlines for, often more distant, white areas. Second, Plaintiffs state that Defendants rejected or disregarded the numerous requests for waterlines to be extended into Coal Run, while at the same time pursuing projects in response to requests from white areas. Third, Plaintiffs claim that Defendants denied individual requests from Coal Run residents to connect to an existing line—the Old Adamsville Road line—while letting white homes connect.

### 1. Defendants' General Roles in Providing Water to Coal Run

Plaintiffs assert that all Defendants had a responsibility to provide water to Coal Run residents. First, Plaintiffs state that the City supplied water in two ways: (1) since the 1930s, the City regularly constructed water projects in various areas adjoining the City; and (2) from 1956 until 2004, the City operated and controlled the Old Adamsville Road line, which served white residences on Adamsville Road and down Langan Lane, both of which border the Coal Run neighborhood. Plaintiffs state that, for the first forty-two years of the Adamsville line's existence, the City partnered with the Washington Rural Water Authority ("WRWA") in the operation of the line, and obtained exclusive control over it in 1998 when WRWA dissolved.

Second, Plaintiffs assert that the County was also responsible for providing residential water services. Plaintiffs state that in 1967, the County created the East Muskingum Water Authority ("EMWA") as an independent water authority, and the EMWA constructed water projects

3

throughout its jurisdiction over the following thirty-six years.  The County advocated for water services for various predominantly white areas since at least 1978, and the County began funding and constructing water projects throughout the County in 1990.  In 2000, the County acquired a portion of the EMWA and began increasing efforts to bring water to County residents.  Plaintiffs assert that in 2003, the County acquired the EMWA in its entirety and, by doing so, expressly assumed the EMWA's liabilities as part of the acquisition.

Finally, Plaintiffs state that Washington Township encompasses the Coal Run area. Plaintiffs claim that, starting in approximately 1995, the Township began making substantial efforts, including through legislation and advocacy, to obtain water for some of the predominantly white areas of the Township, while at the same time ignoring Plaintiffs' requests.

### 2. Plaintiffs' Timeline for the Provision of Water in Muskingum County

Plaintiffs state that discriminatory provision of water in Muskingum County began in 1954 when the City and the WRWA instituted plans to build the Old Adamsville Road waterline. Plaintiffs claim that the City approved the line and supervised construction, which stopped just before the Coal Run neighborhood.  Before the installation was complete, Plaintiffs claim that Coal Run residents began asking to have the line extended to their neighborhood.  Moreover, Plaintiffs' efforts continued even after the line was in place.  Plaintiff Marvin Kennedy testified that he attended multiple meetings in 1954, 1955, and 1958, where he and other Coal Run residents sought water.  Plaintiff Rodney Hale stated that he contacted WRWA representatives throughout the 1950s and 1960s requesting that water be run into the Coal Run neighborhood and received no response or was told that the line was too small to include Coal Run.  Plaintiff John Paul Mayle testified that his father requested water in the late 1950s or early 1960s from a City official.  Moreover, in 1963,

4

Plaintiff Richard Kennedy, Sr., attended a meeting at the Township fire station where he and others specifically asked to be connected to the City and WRWA waterline. Plaintiffs claim they were told that it could not be done. From 1954 to 1967, Plaintiffs claim that the City and the WRWA controlled who was permitted to tap into the Old Adamsville line and, unlike their predominantly white neighbors, the City and WRWA never permitted the Coal Run residents to connect.

In 1967, the County formed the EMWA to provide water service throughout the County. Shortly after EMWA's formation, Coal Run residents approached the EMWA to request water service for their neighborhood. Plaintiff Kennedy, Sr. testified that he attended a meeting in 1968 or 1969, where he and other residents expressly sought water service from the EMWA. Plaintiff Hill also testified to attending a meeting at the Washington Township firehouse around the same time when one of her neighbors asked when water could be brought to Coal Run. A few years later, a group of at least ten Coal Run residents appeared at an EMWA board meeting to request water service. In a departure from its usual practice, Plaintiffs assert that the EMWA did not respond to the request by conducting a preliminary engineering study to estimate likely costs, but instead, directed the residents to obtain signed contracts and deposits from those Coal Run residents who wanted water service. Several residents testified that they signed contracts and paid deposits, but the EMWA still took no action to provide them with access to water.

In the meantime, Plaintiffs state that they continued making water requests to the City and the WRWA. The Kennedy Plaintiffs claim that they took turns throughout the 1960s attending bi-monthly WRWA meetings to ask about water service. When a request for water was made to the WRWA, its normal practice was to collect a $350 association fee and pass the applicant's name onto the City for a determination of whether a tap would be installed. Once the City received the

5

applicant's name, the City's policy for granting a tap-in request was to allow the tap if there was "sufficient water to serve additional customers."  Plaintiffs claim that, while the City and WRWA allowed a number of white applicants to connect to the Old Adamsville Road line, none of the requests for water from the Coal Run residents was granted throughout the 1960s and 1970s.

In 1978, Plaintiffs claim that the County began its own independent participation in water services in different parts of the County.  Plaintiffs state that the County agreed to work with the City and WRWA to research and provide assistance in meeting water needs in a predominately white area north of the Coal Run neighborhood.  In addition, Plaintiffs claim that the County contracted with an engineering firm in 1982 to examine bringing water to Rix Mill, another predominantly white area.

In 1984, the EMWA voluntarily released the Coal Run neighborhood from its jurisdiction as a result of a joint City and WRWA effort to turn the WRWA into a legally constituted water authority, allowing it to apply for funding to replace and upgrade the existing Old Adamsville Road line.  Even though the EMWA developed water-services projects for neighborhoods outside its jurisdiction, it never did so for Coal Run.  Thus, Plaintiffs maintain that Coal Run residents, throughout the 1980s and 1990s, made efforts to approach each entity that might provide water to the neighborhood, but were regularly denied.

In the late 1980s, Plaintiff Nancy Kennedy asked for water from WRWA and overheard the representative say, "Those niggers will never have running water."  Plaintiff Helen McCuen also testified about attending a meeting around 1981 where the Coal Run residents were told that "they couldn't bring [water] out here, out our way."  Plaintiffs claim that numerous residents also requested water service from the City Water Superintendent, Robert Pletcher ("Pletcher"),

6

throughout the 1980s and 1990s. When asked by Plaintiff James Hill, Pletcher allegedly responded that he did not understand why the area could not get water, and when approached by Plaintiff Kennedy Sr., Pletcher made a reference to pressure, discussed a planned pumping station, and then said he was not in charge. Pletcher also told Plaintiff John McCuen that the available lines could not bring water to Coal Run. Plaintiffs claim that the City referred Plaintiff John McCuen to the EMWA, where he was told that his request was a City problem, and when Plaintiff Mary Kennedy called the City seeking water for Coal Run, she was told it was a County issue. Meanwhile, the Plaintiffs allege, the City extended and improved waterlines in predominantly white areas outside the City limits.

Plaintiffs state that, beginning around 1990, the County became more active in funding and constructing a host of water projects, particularly for commercial entities, some of which also served nearby residential users. Plaintiffs claim that the County also pursued funding for projects serving residential areas in predominantly white areas of the County.[1] In addition, Plaintiffs state that in 1993, County representatives made requests to the EMWA to provide water to homes in the predominantly white Lakeview Heights, which had been experiencing acid water in its wells as a result of coal mining in the area. Meanwhile, Plaintiffs allege that County Commissioners were aware that Coal Run had similar problems, yet offered no remedy. Plaintiffs claim that Commissioner Montgomery stated that there was a long history of poor and failed wells in that area and was aware of the high sulfur content in the groundwater. Plaintiffs state that Montgomery also

---

[1] For example, Plaintiffs state that County Commissioners approved the expenditure of Community Development Block Grant money for the South Zanesville water project, contributed funds for water plan improvements in the Village of Frazeysburg, and funded and participated in a major water project in the Village of New Concord.

noted that she received petitions and phone calls from Coal Run residents asking for water. Plaintiffs also allege that because Commissioner Madden had been a Township Trustee and attended EMWA meetings where Coal Run residents sought water service, he was similarly aware of the residents' water problems.

Plaintiffs assert that in 1995, Township Trustees became more active in seeking water for certain areas in the Township. Plaintiffs claim that the Trustees went door-to-door collecting signatures on a petition for water service in a predominately white area just east of Coal Run and presented the petition to the EMWA. After an initial engineering report was completed for the new Adamsville Road project, the EMWA directed the Trustees to contact residents to see if they were interested in signing up. Plaintiffs claim that the Trustees then participated in the public meetings held to encourage residents to sign up for the proposed water line. Plaintiffs state that the Township Trustees did not include the Coal Run area in the proposed project.

Plaintiffs claim that in the late 1990s, the County continued its efforts to improve water to certain white areas of the County. Among its projects was the "Adamsville Road Booster Station" which improved the water service for the predominantly white area along Old Adamsville Road and halfway down Langan Lane, which ended next door to the first African-American family in Coal Run. The County contributed $6500 to the project and obtained federal funding for low- and moderate-income areas. Plaintiffs allege that, although it did not supply water to them, the County used Plaintiffs' relatively low incomes to qualify for the federal funding. Plaintiffs claim that the WRWA also contributed funds and the City was involved in installing the pump for the Booster Station.

In 1996, the WRWA approached the City about disbanding the WRWA and putting the

ownership and operation of the Old Adamsville Road line exclusively under City control.  Pletcher stated that there was no reason for WRWA to stay active, as it was only formed in an attempt to get funding for system upgrades that had been completed.  Plaintiffs state that Ohio EPA had already concluded that the City was operating the Old Adamsville Road line.  In April 1998, the WRWA was formally dissolved and, as reflected in the dissolution order, the City "assumed and will continue to provide water service to the residents of the area served by [the WRWA]."  The City received all of the WRWA's assets and records.  Plaintiffs claim that the City's responsibilities did not change, however, as it simply continued its complete control over the line, and residents of the Coal Run neighborhood still were not allowed to tap-in.

Plaintiffs maintain that Coal Run residents continued to seek water from the City.  For example, Jerry Kennedy testified that he made multiple requests for water in the late 1990s, including, in 1998, demanding to know why his white neighbors were allowed to connect to the water line.  Pletcher responded that he was not involved.  In a 1998 memorandum to the City's Service Director, Pletcher noted that he "had three inquiries in recent weeks on two different properties concerning a water main extension on Coal Run Road."  Plaintiffs state that Pletcher also testified that Matilda Kimble from Coal Run asked for water service in the late 1990s.  In response to her request, Pletcher drew up a proposal regarding how the City could extend a waterline down Coal Run Road; Pletcher took this plan to City officials, but they did not follow up.

In the fall of 1999, Joyce Hill, an employee with the State Department of Development, contacted the City's fair housing compliance officer about the need for water in the Coal Run neighborhood.  The City's Public Service Director at the time, Jay Bennett, recognized that a racial disparity existed in the delivery of water service and proposed that the City attempt to fix it.  In

9

response, Pletcher conducted and drafted a new study for extending water from the City into the Coal Run neighborhood. In this March 2000 study, Pletcher stated that "[f]or at least the last thirty-five years the residents of Coal Run Road, Langan Lane . . . have approached various members of the Zanesville Water Division as to the possibility of extending water into their neighborhoods." Pletcher proposed an improved water main, at a cost of under $450,000, that would serve the Coal Run neighborhood, and suggested that this new water main replace the water system that was already serving residents on Old Adamsville Road and the northern part of Langan Lane. The City also conducted a preliminary engineering study, approached the County about funding for this project, and gave the study to the County for its review. Plaintiffs, however, claim that the County Commissioners rejected the proposal and that the City took no action to construct the proposed project.

Despite the fact that the Township Trustees' proposed New Adamsville Road project had failed for lack of interest in 1995, Plaintiffs claim that the Trustees continued their efforts to bring water to the area through 2001, and the EMWA completed the "Pleasant Grove-Adamsville Road" project in 2002. The project served all of the white residences directly to the east of the Coal Run neighborhood and apparently would have only needed to be extended another 2,000 to 3,200 feet to reach the Coal Run neighborhood. Plaintiffs explain that one step in this process involved a law that permits a township to petition a regional water district for inclusion of part of their township into a water district. Pursuant to this law, the Township passed a resolution requesting the area's re-inclusion in the EMWA's jurisdiction as "an emergency measure necessary for the immediate preservation of the public health, safety, and welfare, because of the residents' immediate need for safe drinking water and fire suppression." Although this area was adjacent to the Coal Run

10

neighborhood, which also had safety and health issues related to water, no similar resolution was ever made to re-incorporate the Coal Run Area into the jurisdiction of EMWA.

In 1999, the County created a Countywide Water and Sewer District and began working toward merging the EMWA into this new district. In December 2000, the County entered into a formal cooperative agreement with EMWA, which gave the County a ten percent interest in EMWA's water treatment plants and well fields. Once the County acquired a portion of EMWA, the County attempted to identify the areas where the County and the EMWA could build new water projects. Plaintiffs allege that, between January and April 2001, the County sought over seven million dollars to fund seventeen residential water projects; Coal Run was not on the list.

On December 13, 2001, Plaintiffs Jerry Kennedy and Richard Kennedy, Jr. attended a County hearing on water projects. At that meeting, Jerry Kennedy asked about getting water in the Coal Run neighborhood. In response, Plaintiffs claim that Commissioner Montgomery stated that the area "would not have water until the President dropped spiral bombs and hopefully hit deep enough to hit good water." Further, Montgomery allegedly stated that maybe Coal Run's "great grandchildren would see water." Commissioner Madden allegedly responded to the Coal Run residents' requests by saying that there were not enough houses in the area to support a water project. Plaintiffs claim that Madden placed the cost at $3.5 million, even though the County had not conducted any cost analysis or examined the homes that might seek service, and even though the City's assessment from 2001, which the County had received, had only projected a cost of $1.9 million.

Further, Plaintiffs maintain that the Hairston family contacted the County Health Department about obtaining water service and the County representative told them that they would have to dig

a well.  Plaintiffs claim that Ms. Hairston held numerous meetings with neighbors about the lack of water, and on the morning of one of the meetings, she awoke to find a severed pig's head in her driveway.

In 2003, the County acquired the EMWA in its entirety.  Plaintiffs assert that under this acquisition agreement, the EMWA transferred all of its assets and liabilities to the County and then dissolved.  The County continued operating the EMWA's water system, serving its current customers and employing its current personnel.  The first three projects commenced by the County were for Candlersville, Adamsville Road, and Gaysport—all predominately white areas—even though the Commissioners allegedly knew that the EMWA had earlier rejected the very same projects because of both a lack of interest by each area's residents and because none of the three projects was economically feasible.

In the spring of 2002, the residents of the Coal Run neighborhood retained counsel to assist them in obtaining water.  On May 28, 2002, counsel sent a letter to the County, City and the EMWA asking that they "immediately come together to take whatever steps are necessary" to bring water to the neighborhood.  In July 2002, a meeting was held to discuss the need for water in Coal Run. The residents asked for water service, and again pointed out the racial disparity between the treatment of their neighborhood and that of the surrounding areas.

On July 26, 2002, Plaintiffs filed discrimination complaints with the Ohio Civil Rights Commission alleging that the County, City, and Township had engaged in a pattern and practice of discrimination in violation of the fair housing laws by refusing to provide water service to the Coal Run neighborhood.  On August 14, 2002, the Governor's office convened representatives of all area governments to discuss how to deal with the lack of water service in the Coal Run area.  The County

soon commenced a water project for Coal Run that would be covered almost entirely by state and federal grants.  Construction began shortly thereafter, and in early 2004, the Coal Run residents received running water.

### B.  The Facts Presented by Defendants

The Defendants dispute Plaintiffs' factual allegations in many respects, particularly regarding Defendants' alleged responsibility to provide water services to the Coal Run neighborhood.[2]

### 1. <u>City</u>

In 1955, the City passed an ordinance permitting extension of water lines outside City limits along the Adamsville Road and Langan Lane.[3]  The City took this action after the Washington Rural Water Association, a private, non-governmental group  ("WRWA-Private"), sought public water service from the City.  The City asserts that WRWA-Private had no connection to any named defendant in this case and that WRWA-Private was led by a board of citizens living just north of the Coal Run area who paid for installation of the mains with private money, and no City funds were used.

The City maintains that permission to extend the water line was based upon the six conditions in the Ordinance, including that the residents be responsible for the costs of construction and the residents agree to pursue annexation.[4]  The City asserts that no Plaintiff ever agreed to these

---

[2]      Defendants preliminarily note that the requirement of hauling water for personal use is not unusual for residents of predominately rural Muskingum County, large areas of which have been subjected to underground and strip mining.  According to available census data, nearly twenty-eight percent of housing units receive water by means other than public water systems.

[3]      Under Ohio Revised Code § 743.12, municipal corporations in Ohio are expressly authorized, but not required by Ohio law to extend water pipes outside the city limits.

[4]      The Ordinance states as follows:
Whereas certain residents of the Adamsville Road-Langan Lane vicinity, outside the

13

conditions of water services or to annexation.

The installation of the water line along Adamsville Road and Langan Lane took place in 1956, and the City states that WRWA-Private received and handled requests for water service. According to John Michel, a board member of WRWA-Private since the late 1960s, request issues were decided by a majority vote of the board members. The WRWA-Private required an application and up-front payment from persons seeking water, and that the location of the property seeking water service be close to or join the original water mains on Adamsville Road and Langan Lane, as WRWA-Private did not extend water mains beyond those initial main lines. Michel explained that only when an application was approved by the board would the information be passed onto the City, and the decision whether to allow persons to "come on the lines" was made by the private board, not the City. The City claims that no decision of the WRWA-Private board was based on the race of the applicant and that it did nothing to prevent or restrict persons from receiving water through

---

corporate limits of Zanesville, Ohio have requested Council for the extension of a water main, at their expense;

. . . .

    That permission . . . is granted . . . upon the following conditions:

(a)    That said line be a cast iron line, four inches in diameter on Adamsville Road; and not less than two inches in diameter on Langan Lane.

(b)    That the cost of the construction of said line will be assumed by and be paid by the property owners benefitting from said line, and that the construction of the same shall be under the supervision of the Superintended of Water Works.

(c)    That the necessary number of fire plugs, as may be designated by the proper city officials, be installed in said line of the property owners, at no cost to the City.

(d)    That no person shall be permitted to tap said extended line without paying the regular tapping charges and his or her proportionate share of the construction of said line.

(e)    That the parties tapping or using said extended line shall agree to use their efforts and influence on behalf of annexation of the City of Zanesville.

(f)    That all persons tapping into said extended water line shall pay the regular rate for the use of water, as charged in the City of Zanesville, at any particular time in the future, plus ten percent.

14

WRWA-Private.

In 1984, the Washington Rural Water Authority was established as a legal entity recognized as a water authority ("WRWA-Legal"), and was given exclusive authority in its geographic region over provision of water services including new water service in Coal Run. From 1984 to 1988, WRWA-Legal attempted to secure funding and otherwise promote the establishment of water services in its jurisdiction, including the Coal Run neighborhood. Specifically, the City asserts that WRWA-Legal attempted to secure funding—but was never successful—from: (1) the Ohio Water Development Authority; (2) OMEGA; and (3) the U.S. Department of Agriculture, Farmers Home Administration.

In April 1998, the WRWA-Legal was dissolved by the Muskingum Common Pleas Court, and the City assumed the responsibility for provision of water to the area serviced by the WRWA-Legal. Therefore, the City asserts, it had no responsibility to provide public water outside of its corporate limits to the Coal Run area until April 1998, at the earliest. Furthermore, at such time, the City claims that its responsibility was merely to maintain service to existing WRWA-Legal customers and not to add new areas. The City states that after the dissolution, no requests for extension of water service or separate taps in Coal Run were received by the City. The City performed no water line extension projects from April 1996 until June 2001, when Jay Bennet commenced his term as Public Service Director.

The City maintains that of the sixty-eight individual Plaintiffs, fifty-six did not make a request to the City for public water service. The City states that Plaintiffs failed to distinguish alleged requests for water service made to WRWA from those, if any, made to the City. The City contends that Plaintiffs' allegations of conversations and meeting attendance that they characterize

15

as requests for water service were in no way related to the City and that the City is not responsible for WRWA actions in these meetings or conversations.  For example, Plaintiffs cite Marvin Kennedy's and Jerry Kennedy's depositions in which they recalled attending a meeting where they requested water service.  The City states that the Kennedys' reference to those present at the meeting were to members or officers of WRWA-Private and had no connection to the City.  To the extent Plaintiffs did discuss water service with Pletcher, the City claims that the conversations occurred prior to the 1996 installation of the Adamsville Road Booster Station to improve water pressure in existing lines.  Such Plaintiffs were accurately informed that pre-booster, there was insufficient pressure to add new lines.

Further, the City states that the Plaintiffs' claims did not arise while they lived within the geographic limits of the City because the Coal Run area is outside the Zanesville corporate limits. The City disputes Plaintiffs' assertion that the City regularly constructed water projects in various areas adjoining the City.  The City states that the only project constructed outside the City's boundaries was that extending a tap to an Ohio University branch; according to the City, this was not an addition of residential service, but a tap on which the university built its own water system. Private citizens installed lines that were eventually connected to and served by the City system at no cost to the City.  Although the City replaced a section of a pipe to cure leakage in the Quincy area of Springfield Township and in Wayne Township outside the City's corporate limits, the City asserts that it did not extend, nor did it improve service.

## 2.  Township

The Township states that it was unable to furnish water to Plaintiffs or any residents at any time, because under Article XVIII of the Ohio Constitution, the Township does not have the

statutory authority to own, construct, or operate its own water lines.[5] The Township admits, however, that it is aware of Ohio Revised Code § 505.263, which provides that a township *may* enter into a contract with a board of county commissioners under which the township agrees to pay all or any part of the cost of constructing, maintaining, repairing, or operating a water supply improvement project. The Township asserts that it has never engaged in the business of providing water to any residents of the Township, and therefore, has never treated any group of citizens more or less favorably than others. The Township provides services with respect to maintenance of roads and cemeteries—including the Coal Run area—and has never sought to provide additional services or obtain water service from any other entity. Further, of the sixty-eight individual Plaintiffs, sixty-seven were deposed and none of them ever made a request to the Township or Trustees for water services.[6] The Township states that it did not receive any requests for water service.

The Township further states that Plaintiffs rely on a distorted interpretation of Trustee Culbertson's testimony—not Plaintiffs' own testimony—as the sole basis for their contention that Plaintiffs (specifically Plaintiff Jerry Kennedy) "requested" water from the Township Defendants. The Township and Trustees respond that the testimony does not support Plaintiffs' assertion. Particularly, the Township states that Plaintiffs only cite to the following testimony by Trustee Culbertson in their argument that a request for water was directed to the Township Defendants:

Q.    With these folks that have brought up these water issues to you on occasion, do you recall anyone from the Coal Run, Langan Lane area ever asking about getting water?

---

[5]    The Township cites section 4 of Article XVIII, Section 4, which delegates such authority to municipal corporations.

[6]    The Township states that the only Plaintiff who was not deposed entered a stipulation pertaining to her personal requests for public water indicating that she merely attended some meetings but did not identify any specific request for water that she made.

17

A.   Yes, one -- one person.

Q.   All right. And who was that?

A.   When we were working on my house, Jerry asked me -- Jerry Kennedy asked me how to go about getting water down in their area. I told him to get a petition, get people to sign it and take it to the Commissioners.

Q.   Do you recall what year that was?

A.   It would have been 2002. We were finishing my new house.[7]

Q.   That's the only person you recall from Coal Run --

A.   Yes.

Q.   -- asking about water for -- asking you about water?

A.   Yes.

***

Q.   And you didn't do anything in response to what you heard from Jerry and Lonnie Kennedy about there not being water down there?

A.   You know, and I -- I told Jerry that that's what he needed, to get a petition and get it done, and I might have mentioned it to Don Madden that they were wanting water down there. I don't recall.

The Township points out that, while Plaintiffs rely on the above testimony to support their

contention that Plaintiffs requested water from the Township, Plaintiff Jerry Kennedy's own

testimony does not support Plaintiffs' argument.  Upon being asked whether he ever made any

request to the Township, Defendant Culbertson, or any other Defendant Trustee to have public water

run to his residence in Coal Run, Plaintiff Jerry Kennedy replied, "No."

The Township states that Plaintiffs' argument that the Township Defendants actively pursued

---

[7]      Plaintiff Jerry Kennedy went to school with Defendant Culbertson and Plaintiff Kennedy also helped his brother perform some work on Defendant Culbertson's house.

water on behalf of predominately white areas within the Township is not supported by the very evidence Plaintiffs' cite. Instead, the Township argues that the testimony of Donald Madden[8] and Doug Culbertson shows that they participated in petitions to the EMWA to obtain water services in their personal capacities only. The effort to obtain water service was made by individual members of the community and not led by or directed by the Township Defendants.

Subsequent to the WRWA-Legal's dissolution, the EMWA and the County engaged in a joint effort for the development of the Adamsville Road line whereby the EMWA would extend its lines as far as it could within its jurisdiction and connect with County lines for the County's future development of Pleasant Grove Road. The Township asserts that it was necessary for the County to connect to the EMWA lines in order for the Township to obtain water. Essentially, the Township explains, portions of Adamsville Road were the middle ground between the two jurisdictions and were part of the Township. After it was decided to undertake the Adamsville Road project, however, it was determined that a portion of Adamsville Road was not within the EMWA jurisdiction as a result of the 1984 removal of that area from its service.

Consequently, according to the Township, the EMWA needed to have the previously excluded portion of Adamsville Road reincorporated into the EMWA jurisdiction so that the project could go forward. The Township and Trustees state that they did not ask the EMWA to incorporate this portion of Adamsville Road in the project. Rather, the EMWA, through its legal counsel, James Krischak, prepared a resolution for the Township Trustees to sign which would return this portion of Adamsville Road back to the EMWA. The Township asserts that Krischak testified that the

---

[8]     Donald Madden is sued, in his personal and official capacity, as County Commissioner. He also served as a Washington Township Trustee from 1994-1999.

Township and Trustees had no input regarding the language of the resolution or in determining where the waterline for the Adamsville Road project would be run. The language of the resolution was, instead, taken directly from the Ohio Revised Code and was required to be included in order to reincorporate that part of the Township into the EMWA.

On April 19, 2001, the Trustees signed off on the resolution reincorporating that portion of the Township into the EMWA. The Trustees stated that they signed off on the resolution because the project would provide water to the Washington Township Firehouse, as the Township Volunteer Fire Department previously had to go to a local school to fill their tanks in the event of a fire. The Trustees and Township assert that the fact that some homes would also receive water off of this line that served the firehouse was not relevant to the Trustees' decision. Rather, the Township states, the decision to sign the resolution was for the benefit of all Township residents to the extent that it improved the fire department's ability to serve the community.

The EMWA was legally dissolved in February, 2003, after the Adamsville Road project was complete. The Township and the City state that much of Plaintiffs' confusion about water services arose as a result of the creation of EMWA and WRWA-Legal, their existence at the same time, and that the WRWA-Private had operated prior to the creation of WRWA-Legal. In addition, Defendants state that, while having no connection to the Township, Trustees, or County, these groups often met at municipal locations such as the Township fire station and the County courthouse.

### 3. County

The County states that its efforts to create a public water service infrastructure are still in their infancy, and that prior to 2000, the County had fifty-six public water systems throughout the

County, most of which were established by business entities and residential subdivisions that were making inefficient use of their water resources. The County Commissioners recognized that the growing number of independent water systems posed increased health risks because they were impossible to monitor. The County resolved to establish a countywide water and sewer district to be formed under the provisions of Chapter 6117 of the Ohio Revised Code. In order to do so, the County needed a water source, and therefore, requested that the EMWA, the largest water district in the County, consider a merger with the County. On December 13, 1999, the County issued an official Resolution regarding its intent to merge with the EMWA.

On December 7, 2000, the County entered into a Cooperative Agreement with the EMWA which allowed the County to purchase a ten percent interest in the EMWA's water treatment plan and well field. On October 23, 2002, an Acquisition and Dissolution Agreement (the "Agreement") was executed between the County and the EMWA. In this Agreement, the EMWA conveyed all of its assets to the County, and the County agreed to operate and to maintain the current water systems. As to liabilities, Section 5 of the Agreement reads:

> Assignment and Assumption of the Authority Liabilities. The Authority hereby assigns to the County, and the County hereby assumes and agrees to discharge, the Authority Liabilities, all subject to and effective as of the occurrence of the Closing; provided, however, that the County shall not be liable for damages arising from any breach under the Authority Liabilities[9] by the Authority prior to

---

[9]Appendix F to the agreement defines "Authority Liabilities," but Plaintiffs do not attach Appendix F to their exhibit. Rather, they attach Appendix E. Appendix E contains a list of ligation matters which the EMWA has represented are the only cases pending against it. Appendix E reads:

Litigation

1. Claim of James Robert Julian and USA Casualty Insurance Co. Alleging negligence that resulted in water line break causing damage

21

the Closing Date (as defined in Section 9 hereof).

Subsequently, in a judgment dated February 28, 2003, pursuant to the Agreement, the Common Pleas Court of Muskingum County ordered that the EMWA "be and is hereby dissolved upon the transfer by the [EMWA] to the [County] of [EMWA's] water system and the assumption or satisfaction by [the County] of [EMWA's] liabilities." The court also stated that "except for those liabilities assumed by [the County] pursuant to the petition and the Acquisition Agreement] the County will not be liable for the liabilities of EMWA."

The County states that before it took over the EMWA in 2003, it did not make decisions regarding where water lines were laid throughout the County; rather, the County only helped to provide funding for economic development projects for commercial or industrial needs. Once the County acquired a water source in December 2000, it states that it gave priority for public water lines to areas that had for decades petitioned for public water service and also had great need. The first three projects planned by the County Commissioners included the Adamsville Road, Gaysport, and Chandlersville Road projects. Allegedly, Adamsville Road residents had repeatedly petitioned the EMWA and had even petitioned the Ohio Department of Natural Resources to try to get water to their area. Over one-hundred fifty residents in the Gaysport area had submitted written petitions for public water service. Individuals, businesses, and the County and City Health Departments had petitioned for water to be brought to the Chandlersville area, where the quality of ground water was

---

to a customer's residence.

2. Investigation by the Ohio Civil Rights Commission as a result of complaints from the residences located within Langlan Lane, Coal Run Road, Wallwork Avenue and Russell Street alleging discrimination based on race in failing to extend water lines.

22

unsafe.

Unlike the Adamsville Road, Gaysport, and Chandlersville Road projects, the County Defendants claim that they had never received any petition from residents in the Coal Run/Langan Lane neighborhood requesting public water service. In the fall of 2000, however, County Commissioner Don Madden was approached by Jay Bennett, Public Service Director for the City, regarding a possible Coal Run Road water project.[10] Bennett indicated to Madden that the City was considering extending water in the Coal Run area and sought the County's involvement in applying for a Community Development Block Grant ("CDBG"). Bennett indicated that the City would construct the water project if the County could obtain the grant funding.[11] The County Commissioners agreed to assist the City with financing of water lines in the Coal Run/Langan Lane area by applying for the CDBG grant.

Mike Sims later replaced Bennett, and on or about December 2001, Madden met with Sims regarding the Coal Run project, at which time Sims had an engineering proposal estimating that the project would cost over $1.9 million. Madden was allegedly surprised at the cost, as he had an understanding that the cost of running water pipes was, on average, about $125,000 per mile. Because the Coal Run project was approximately a four-mile project, the estimate seemed

---

[10] According to the County, the City had been contacted in 1999 or 2000 by Joyce Hill, of the Ohio Department of Development and a personal friend of many of the residents in the Coal Run/Langan Lane neighborhood, regarding the fact that the Coal Run neighborhood did not have public water. Joyce Hill contacted the Fair Housing and Contract Compliance Officer for the City, who set up a meeting with Bob Pletcher, the City's Water Superintendent, and Jay Bennett, Public Service Director for the City. The County asserts that Hill did not contact any County representative regarding this meeting.

[11] The reason the County was required to apply for the CDBG grant was because the Coal Run/Langan Lane neighborhood was located within the County, outside the City limits.

unreasonable.  Pletcher had also estimated the cost of the project at just over $435,000.  Madden took the engineering proposal back to his fellow Commissioners who decided that it would not be fair to debt-service a $2,000,000 water project on the residents of Coal Run.

Commissioner Madden, however, claims that he did not abandon the idea of a Coal Run Road water project, and instead, discussed with the EMWA a planned EMWA water project for Pleasant Grove Road that was being considered for construction in 2002.  The project would bring a water source close to the Coal Run/Langan Lane neighborhood, making a Coal Run project feasible for the County to construct.  This discussion, according to the County, occurred before any resident of the Coal Run/Langan Lane neighborhood had requested public water service from the County.

The County claims that Joyce Hill, of the Ohio Department of Development, developed a strategy to lay the framework for filing a complaint of race discrimination.  In either 1999 or 2000, Hill informed Plaintiffs Jerry Kennedy and Richard Kennedy, Jr. of their right to file a lawsuit or a complaint with the Ohio Civil Rights Commission.  Knowing that a typical fair housing complaint requirement was to have a recent "denial of services" Hill told the Kennedys that they should attend a December 13, 2001 County public hearing to be held regarding a water project proposed in the Chandlersville area and ask for water to be brought to the Coal Run area.  The Kennedys did attend the meeting, and Jerry Kennedy expressed concerns for the lack of water in his area.  According to the County, even though the hearing was to discuss water in another area, the Commissioners resolved to look into the water situation in that area of the County.

It is at this meeting that Jerry Kennedy claims that Commissioner Montgomery stated that there would be no water at Coal Run "until President Bush drops spiral bombs" in Coal Run and that

Jerry Kennedy's "grandchildren's grandchildren would not have water." The County argues that there were nine people in attendance at that meeting, including an engineer from M-E Companies and a private resident from another area of the County, and of those nine people, only Jerry Kennedy and Richard Kennedy, Jr. claim that these statements were made. The County responds that those in attendance at that meeting have sworn, under oath, that the alleged comments were not made.

The County states that while the Kennedys were the only two Plaintiffs to have requested public water service from the County—and they did so orally at a public hearing called for another purpose, and no petitions were submitted by Coal Run residents—within twenty-five months of the request, the entire neighborhood had access to public water service.

### C. **Procedural Posture**

The sixty-eight individual Plaintiffs and the FHAA filed their original complaint on November 13, 2003. The operative pleading is the Fourth Amended Complaint, filed on December 19, 2005. Plaintiffs allege the following six causes of action in the Complaint, and seek monetary, declaratory, and injunctive relief:

(1)     Unlawful Discrimination under the Fair Housing Act, 42 U.S.C. § 3601 ("FHA Claim") (All Plaintiffs against All Defendants);

(2)     Unlawful Discrimination Under 42 U.S.C. § 1981 ("§ 1981 Claim") (Individual Plaintiffs against All Defendants);

(3)     Unlawful Discrimination Under 42 U.S.C. § 1982 ("§ 1982 Claim") (Individual Plaintiffs against All Defendants);

(4)     Unlawful Discrimination Under 42 U.S.C. § 1983 ("§ 1983 Claim") (Individual Plaintiffs against All Defendants);

(5)     Unlawful Discrimination Under Title VI of the Civil Rights Act, 42 U.S.C. § 2000d ("Title VI Claim") (Individual Plaintiffs against the City, the Township, and the County);

(6)     Unlawful Discrimination Under Ohio Revised Code § 4112.02(H) ("State Law Claim") (All Plaintiffs against All Defendants).

On July 26, 2002, twenty-five residents of Washington Township filed a complaint with the OCRC, which began investigating Defendants' practices. On June 12, 2003, following its investigation, the OCRC concluded that the facts "give rise to the inference that [defendants] failed to provide [residents] with access to public water service because of their race, Black [,] and the racial composition of their neighborhood." This Court permitted the OCRC to be joined as a party plaintiff in this matter on July 12, 2004, and the OCRC filed its Joined Plaintiffs Complaint on August 11, 2004, asserting a State Law Claim against Defendants. The OCRC voluntarily dismissed its previously filed complaint in state court.

On March 14, 2007, the City, Township, and County, each filed motions for summary judgment on all of Plaintiffs' claims. On April 23, 2007, Plaintiffs filed a Combined Response in Opposition to Defendants' motions along with a Cross Motion for Summary Judgment on the narrow issue of whether the County is liable for any acts and/or omissions of the EMWA. All motions have been fully briefed and this Court heard oral argument from all parties on June 4, 2007. Accordingly, the motions are now ripe for this Court's review.

### III. STANDARD OF REVIEW

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any

26

material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.

"[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if

the evidence is such that a reasonable jury could return a verdict for the non-moving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Matsushita Elec. Indus. Co. v. Zenith

Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the

evidence could not lead the trier of fact to find for the non-moving party).

    The standard of review for cross-motions of summary judgment does not differ from the

standard applied when a motion is filed by only one party to the litigation.  *Taft Broad. Co. v. U.S.*,

929 F.2d 240, 248 (6th Cir. 1991).  "The fact that both parties have moved for summary judgment

does not mean that the court must grant judgment as a matter of law for one side or the other;

summary judgment in favor of either party is not proper if disputes remain as to material facts.

Rather, the court must evaluate each party's motion on its own merits. . . ."  *Id*. (citations omitted).

    In evaluating motions for summary judgment, the evidence must be viewed in the light most

favorable to the non-moving party.  *Matsushita*, 475 U.S. at 587.  In the case of cross-motions, the

Court must "tak[e] care in each instance to draw all reasonable inferences against the party whose

motion is under consideration."  *Taft*, 929 F.2d at 248.  The movant has the burden of establishing

that there are no genuine issues of material fact, which may be accomplished by demonstrating that

the non-moving party lacks evidence to support an essential element of its case.  *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382,

1388-89 (6th Cir. 1993).  Significantly, in responding to a motion for summary judgment, however,

the non-moving party "may not rest upon its mere allegations . . . but . . . must set forth specific facts

showing that there is a genuine issue for trial." Fed. R. Civ. P.56(e); *see Celotex*, 477 U.S. at 324;

27

*Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994).

The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.,* 8 F.3d 335, 339-40 (6th Cir. 1993). Furthermore, the mere existence of a scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252).

## IV.  ANALYSIS

Because Plaintiffs' Cross Motion for Summary Judgment deals with a narrow issue of liability that will affect the County Defendants' Motion for Summary Judgment, this Court will address Plaintiffs' Motion before turning to Defendants' Motions.

### A.  Plaintiffs' Cross Motion for Summary Judgment

Plaintiffs move for Partial Summary Judgment on the narrow issue of whether the County is liable for the alleged acts and omissions of the EMWA. Plaintiffs do not seek a ruling on the question of whether the County engaged in discriminatory practices; rather, Plaintiffs only ask this Court to find that if a jury concludes that the EMWA engaged in such practices, the County is liable for those acts as the EMWA's successor in interest.

Plaintiffs contend that the County is liable for the acts of the EMWA under both Ohio and federal common law on successor liability. Under Ohio law, a "purchaser of a corporation's assets is not liable for the debts and obligations of the seller corporation" unless: (1) the buyer expressly or impliedly agrees to assume such liability; (2) the transaction amounts to a de facto consolidation or merger; (3) the buyer corporation is merely a continuation of the seller corporation; or (4) the

transaction is entered into fraudulently for the purpose of escaping liability. *See Cytec Indus. Inc. v. B.F. Goodrich Co.*, 196 F. Supp. 2d 644, 654 (S.D. Ohio 2002) (citing *Welco Indus., Inc. v. Applied Cos.*, 617 N.E.2d 1129, 1132 (Ohio 1993)).

Here, Plaintiffs argue that when the EMWA sold its assets to the County under the Agreement, a de facto merger occurred, thus requiring this Court to impose successor liability on the County under the second *Cytec* exception. In *Welco,* the Ohio Supreme Court set forth four factors which a court must examine when determining whether a de facto merger occurred:

> (1) the continuation of the previous business activity and corporate personnel, (2) a continuity of shareholders resulting from a sale of assets in exchange for stock, (3) the immediate or rapid dissolution of the predecessor corporation, and (4) the assumption by the purchasing corporation of all liabilities and obligations necessary to continue the predecessor's business operations.

617 N.E.2d at 657. It is not a requirement that all four factors be present for a court to find that a de facto merger occurred. *Id.*

The Defendants do not dispute that the first, second, and third factors militate in favor of finding that the Agreement and subsequent dissolution of the EMWA constituted a de facto merger. With respect to the first factor, the record reflects that the County continued the *exact same* business activities as the EMWA and retained many of the same management personnel as the EMWA. The third factor is satisfied because the Ohio court dissolved the EMWA approximately four months after the execution of the Agreement.

Likewise, the second factor of the de facto merger test is satisfied in this case. Although there is no "continuity of shareholders" between the County and the EMWA because neither entity has shareholders and because there was not an assets-for-stock transaction, the absence of such a

29

transaction does not necessarily result in the conclusion that the transaction in question was not a de facto merger. *Id*. at 658; *see also Turner v. Bituminous Cas. Co.*, 244 N.W.2d 873, 880 (Mich. 1976) ("The presence of stock as consideration should be one factor to use to determine whether there exists a sufficient nexus between the successor and predecessor corporations to establish successor liability. However, the absence of an exchange of stock should not be conclusive."). As a result of the Agreement and subsequent dissolution, the County absorbed the EMWA's assets and continued to operate the water authority in the same manner as the EMWA. Thus, the merger and subsequent dissolution "resulted in the nexus between the predecessor corporation and successor corporation that the continuity of shareholders "hallmark" seeks to require, and therefore satisfies the second hallmark of a de facto merger." *Cytec*, 196 F. Supp. 2d at 659.

Although they do not contest that the first three factors are satisfied, Defendants challenge the fourth factor, namely, whether the County assumed the liabilities of the EMWA. Defendants contend that the Agreement and the subsequent dissolution judgment do not transfer the liability associated with this case from the EMWA to the County. Defendants' assertion that the "4-corners" of the Agreement do not expressly assign liability for Plaintiffs' discrimination suit to the County is correct. Section 5 of the Agreement makes clear that the County will assume only the "Authority Liabilities" outlined in Appendix F of the Agreement. Appendix F is a list of routine contracts and other business agreements over which the County was obligated to assume legal responsibility post-dissolution. The liability for the instant suit is not among those listed in Appendix F. Therefore, Defendants argue that they did not assume any liability in connection with this lawsuit.

Importantly, in section 6 of the Agreement, the EMWA warrants that the only pending litigation against it is set forth in Appendix E. Appendix E contains a description of a complaint

30

filed with the OCRC, which is the foundation for the case sub judice. However, nothing in the Agreement, or in Appendix E, expressly addresses whether the parties intended to transfer liability for the matters listed in Appendix E from EMWA to the County.

In any event, whether the Agreement expressly transferred liability for this suit from EMWA to the County is irrelevant under the fourth factor of the *Welco* test. The fourth factor does not ask whether the predecessor company specifically transferred the liability in question to the successor company. If the Agreement did specifically transfer the liability for this suit, there would be no need to apply the four-factor test; the assumption of liability would be a simple question of contract interpretation. As the *Cytec* court held, the fourth factor does not examine if the specific liability in question was transferred; rather, the fourth factor asks whether the predecessor company transferred to the successor company the "liabilities ordinarily necessary to continue" regular business operations. *See Cytec*, 196 F. Supp. 2d at 659. The Agreement did just that. Under section 5, the County assumed many of the everyday business contracts and licenses necessary for it to carry on business as usual at the water company. The County seamlessly and without interruption utilized the same personnel and facilities of the EMWA to supply water to the former customers of the EMWA. Thus, having met the four-factor *Welco* test, the County has become a de facto successor of the EMWA's potential liability to Plaintiffs under Ohio state law.

Plaintiffs also contend that the County is liable, as a successor in interest, for the EMWA's acts and omissions under federal common law. Despite the fact that "the general common law rule . . . is that a corporation that merely purchases for cash the assets of another corporation does not assume the seller corporation's liabilities," under certain circumstances, it may be appropriate to impose successor liability in cases of discrimination where equitable concerns favor a successor's

liability, such as where equitable concerns favor imposing liability against a successor for the predecessor's acts of discrimination. *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1327 (7th Cir. 1990); *see also E.E.O.C. v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1091 (6th Cir. 1974). In addition, another exception to the traditional common law rule occurs if the court finds that a de facto merger took place between two corporations. *Upholsterers*, 920 F.2d at 1325.

In deciding whether a de facto merger occurred under federal common law, the Court considers whether the "equities of the matter favor successor liability because it is the successor who has benefitted from the discriminatory [] practices of its predecessor." *MacMillan*, 503 F.2d at 1092. Additionally, in deciding whether a de facto merger occurred under federal common law, the court examines: (1) whether the successor had prior notice of the claim against the predecessor; (2) whether the predecessor is able to provide the relief requested; and (3) whether there has been sufficient continuity in the business operations of the predecessor and successor. *MacMillan*, 503 F.2d at 1092; *Upholsterers*, 503 F.2d at 1094.

The County does not challenge Plaintiffs' argument that it should be held liable as a successor in interest under federal common law. In any event, the Court concludes that the Agreement and subsequent dissolution in this case qualifies as a federal common law de facto merger. First, Appendix E of the Agreement shows that the County had notice of Plaintiff's discrimination complaint. Second, the County's predecessor, the EMWA, is no longer able to provide Plaintiffs relief because it no longer exists. Third, as discussed above, there is an exact continuity of business operations between the EMWA and the County.

Given that—(1) a race discrimination suit under the Fair Housing Act can be likened to an

32

employment discrimination suit under Title VII as in *MacMillan*; (2) the County benefitted from the alleged discriminatory practices of the EMWA; (3) the EMWA no longer exists; and (4) the factors discussed in *MacMillan* are satisfied—the equities favor this Court imposing successor liability upon the County.

The County, relying on the unpublished case of *Taylor v. CSX Transp. Inc.*, No. 05-CV-7383, 2006 WL 2550021 (N.D. Ohio Aug. 31, 2006), also argues that Plaintiffs should be prohibited from using the theory of successor liability because Plaintiffs did not plead successor liability in their complaint. The County asserts that Plaintiffs have pursued their case against the County on a direct liability theory, and argues that prior to Plaintiffs' Motion for Partial Summary Judgment, the County had no notice of Plaintiffs' intent to seek relief on the grounds of both direct and successor liability.

Although it is true that Plaintiffs did not specifically plead successor liability in their complaint, the County misinterprets *Taylor* and the other cases upon which it relies. These cases do not hold that a plaintiff must plead successor liability in his complaint to pursue this theory at later stages in the litigation. Rather, these cases hold that a plaintiff must put the defendant on notice that the plaintiff is pursuing a theory of successor liability in order to further pursue it at trial. Notice, not specific pleading, is the standard. For example, in *Taylor*, the court stated:

> Here, the Amended Complaint alleges that various defendants have assumed the liability of its predecessor as successors in interest. It further indicates which entities are being sued in their present capacities and which are being sued as successors and/or predecessors in interest. Thus, Defendants are fully aware of what claims are being alleged and to what extent they are being sued individually and as successors and/or predecessors in interest. Civil Rule 8(a) requires nothing more.

2006 WL 2550021, at *4; *see also Tucker v. Union of Needletrades Indus. & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005) (noting that the rationale behind prohibiting claims first raised at the summary judgment stage is to prevent unfair surprise to a defendant who had no previous notice of the claim).

In this case, Plaintiffs provided the County with notice that they intended to pursue theories of both direct and successor liability. First, although the specific phrase "successor liability" does not appear in Plaintiff's complaint, in the complaints before the OCRC and the FHAA, both of which have been joined to the complaint in this action, Plaintiffs make clear that they are alleging that the EMWA engaged in a pattern of discrimination against them. Moreover, in the OCRC complaint, Plaintiffs specifically mentioned the County's purchase of the EMWA. Second, various discovery correspondence between the parties has put the County on notice of Plainitffs' intent to use the theory of successor liability. In their interrogatory responses, Plaintiffs detailed the actions of the EMWA, a non-party to this litigation, and connected its liability to the County.[12] In addition,

---

[12] Specifically, the Answer to Interrogatory 12 states:

> In 1984, the East Muskingum Water Authority removed an area, including the Coal Run/Langan Lane neighborhood, from its jurisdiction to avoid serving that neighborhood. In the 1990's Muskingum County began partnering with the East Muskingum Water Authority to develop water projects throughout the eastern portion of the County. Using federal and other funds the County and the East Muskingum Water Authority brought water to many areas surrounding the Coal Run/Langan Lane neighborhood but did not even study the possibility of bringing water to the Coal Run/Langan Lane neighborhood.

> In the spring of 2001, the East Muskingum Water Authority commenced and completed the process to add a portion of Washington Township to its jurisdiction in order to complete a water service project in the area. The area added to the East Muskingum

Defendants have not been prejudiced at this stage in the litigation.  The evidence supporting Plaintiffs' theory of direct liability against the County is very similar to that supporting its theory of successor liability; thus, any discovery that the County undertook to support its defense should have covered both theories.

Under the federal system's liberal notice pleading rules, because Defendants had notice of Plaintiffs' theory of successor liability, and because the Court finds that no prejudice has befallen Defendants by Plaintiffs' failure to use the exact phrase "successor liability" in the complaint, Defendants' argument that this Court must refuse to hear this theory is without merit.

Defendants also argue that the Agreement is void because it violates Ohio Revised Code § 5705.41(D)(1)[13] and, as a result, the County is not liable for the acts of the EMWA.  Specifically,

---

Water Authority's jurisdiction did not include the Coal Run/Langan Lane neighborhood.

In the spring of 2002, the East Muskingum Water Authority and the County developed the Adamsville Road water project, which included two separate lines that terminated mere yards from the Coal Run/Langan Lane neighborhood.

[13]      This statute provides:

Except as otherwise provided in division (D)(2) of this section and section 5705.44 of the Revised Code, [no subdivision or taxing unit shall] make any contract or give any order involving the expenditure of money unless there is attached thereto a certificate of the fiscal officer of the subdivision that the amount required to meet the obligation or, in the case of a continuing contract to be performed in whole or in part in an ensuing fiscal year, the amount required to meet the obligation in the fiscal year in which the contract is made, has been lawfully appropriated for such purpose and is in the treasury or in process of collection to the credit of an appropriate fund free from any previous encumbrances. This certificate need be signed only by the subdivision's fiscal officer. *Every such contract made without such a certificate shall be void* . . . (emphasis added)

35

Defendants allege that the Agreement is void because a fiscal certificate was not executed along with the Agreement as required by Ohio law.  Although the Agreement may be void for the reason stated by Defendants, Plaintiffs are not asserting any rights under the Agreement.  Plaintiffs argue that a de facto merger occurred when the County succeeded to the interests of the EMWA, not that the Agreement itself made Plaintiffs third-party beneficiaries to the activities contained in the Agreement.  Thus, the validity and enforceability of the Agreement is irrelevant for purposes of determining whether the County is the EMWA's successor in interest.  Moreover, given that the County has smoothly operated the business for several years since the execution of the Agreement, its attempt to void the contract at this time is barred by the equitable doctrine of laches.

Next, the County argues that successor liability is not a cognizable claim against a political subdivision and may only be used against a corporation or other business entity.  This argument is devoid of merit.  First, the County cites no statute or case law that establishes that successor liability may be applied only against corporations.  Second, the courts have extended doctrines previously applied only to corporations to cities and townships as well.  *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 791 (1998) (extending vicarious liability to a city under Title VII); *but see, Foster Wheeler Energy Corp. v. Metro. Knox Solid Waste Auth., Inc*., 970 F.2d 199, 202-03 (6th Cir. 1992) (refusing to allow plaintiff to "pierce the corporate veil" of a city under the theory that it had an interest in a waste management entity).  In addition, the statutes at issue here (the FHA; 42 U.S.C. §§ 1981, 1982, and 1983; and Title VI), and their concomitant jurisprudence, disfavor discrimination, whether hidden or overt, in all its forms. Indeed, even normal immunities do not apply to governmental entities.  For example, Ohio Revised Code § 2744.09(E) prevents state-government entities from being held immune to liability for federal statutory violations. *See Craig*

36

*v. Columbus City Sch.*, 760 F. Supp. 128, 130 (S.D. Ohio 1991) (holding that a statute providing political subdivisions with immunity from liability in civil actions did not afford city immunity from liability in federal civil-rights action).

Accordingly, this Court finds that it is appropriate to extend successor liability to the County.

Finally, the County argues that any claims against the EMWA are timed-barred. Without citing the applicable statute of limitations, the County asserts that because it has been four years since the EMWA has been dissolved, Plaintiffs' claims are "barred by the applicable statute of limitations." As discussed below, because the County engaged in a "continuous violation" of Plaintiffs' rights, its statute of limitations defense is meritless.

Because the circumstances surrounding the dissolution of the EMWA and the County's acquisition of its assets meet the tests for a de facto merger under both federal common law and Ohio state law, it is appropriate to impose successor liability on the County if Plaintiffs prove their case at trial. Defendant has not proffered any meritorious arguments to the contrary. Thus, the Court **GRANTS** Plaintiffs' Motion for Partial Summary Judgment.

### B. Defendants' Motions for Summary Judgment

Defendants argue that they are each entitled to summary judgment on Plaintiffs' claims for several reasons: (1) Plaintiffs do not have standing to bring claims against Defendants; (2) Plaintiffs' claims are barred by the applicable statute of limitations; (3) Plaintiffs have no direct evidence of discrimination and cannot prove a *McDonnell Douglas* prima facie case; (4) Plaintiffs' claim for injunctive relief is moot; (5) Plaintiffs may not recover punitive damages against a municipality; (6) Defendants are immune from Plaintiffs' State Law Claim; (7) Plaintiffs' claims are barred by laches,

37

waiver and estoppel.  Plaintiffs oppose Defendants' arguments and assert that genuine issues of material fact exist.

### 1. <u>Standing</u>

Before turning to any other issue, this Court must first address whether Plaintiffs have standing to maintain this action.  *Children's Healthcare Is A Legal Duty v. Deters*, 92 F.3d 1412, 1419 (6th Cir. 1996) (explaining that constitutional standing is always a threshold inquiry that courts must make before asserting jurisdiction over the merits of a case).  The determination of whether a particular plaintiff has standing is a two-part inquiry involving constitutional and prudential standing considerations.  *Pestrak v. Ohio Elections Comm'n,* 926 F.2d 573, 576 (6th Cir. 1991).

First, to satisfy Article III's "case or controversy" requirement, a plaintiff must show that he or she "has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf."  *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).   In other words, constitutional standing requires that a plaintiff show: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Cleveland Branch NAACP v. City of Parma*, 263 F.3d 513, 523-24 (6th Cir. 2001) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000)).  Second, in order to meet the prudential limitations on standing, a plaintiff must ordinarily "assert his own legal interests rather than those of third parties."  *Gladstone Realtors v. Vill. of Bellwood*,  441 U.S. 91, 100 (1979).

In this case, Plaintiffs have each alleged an actual, particularized injury in fact. Plaintiffs claim that the pattern and practice of discrimination by Defendants have resulted in economic loss, lack of fire suppression, humiliation, embarrassment, and emotional distress over having poor water. In addition, the FHAA claims that as a result of Defendants' discriminatory policies and practices, the FHAA has been injured by having to divert scarce resources used to identify and counteract such discriminatory practices from its programs and services, including providing counseling and referral services to the public. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (holding that a fair housing organization satisfies the injury requirement where it "devote[s] significant resources to identify and counteract" a defendant's unlawful practices); *Hooker v. Weathers*, 990 F.2d 913, 915 (6th Cir.1993) (concluding that a housing organization had standing to sue under the FHA where it devoted resources to investigating the defendants' discriminatory practices). Further, the OCRC has standing to sue for alleged violations of the State's laws against discrimination. Plaintiffs, however, fail to satisfy the second prong of the constitutional standing requirement with respect to the Township Defendants. Again, in order to have standing, a plaintiff must have suffered injury that is *fairly traceable* to the challenged action of the defendant. *Warth v. Seldin*, 422 U.S. 490 (1975) (holding that low-income plaintiffs challenging a town's restrictive zoning ordinance did not have standing where other factors might have deprived them of housing in the town); *Linda R.S. v. Richard D.*, 410 U.S. 614 (1973) (holding that plaintiff-mother who sought to challenge a child-support statute applicable only to fathers of legitimate children did not have standing where there was no showing that the father's non-payment resulted from non-enforcement of the statute against him). In other words, the injury of which Plaintiffs complain must *result from* or *be caused by* Defendants' illegal conduct.

Although Plaintiffs provide sufficient evidence that their injury is "fairly traceable" to the actions of the County and City—both were active in suppling water to other residents in the area—the relationship between Plaintiffs' injury and the Township Defendants is tenuous at best. Plaintiffs argue that beginning in 1995, the Township Defendants began making substantial efforts, including through "legislation and advocacy" to obtain water for predominantly white areas of the Township.  In support of their theory of liability, Plaintiffs describe the Trustees' efforts to receive water from the EMWA in 1995 and 1996 and the Township Resolution that issued before completion of the Pleasant Grove-Adamsville Road water project in 2002.  Neither satisfies the standing causation requirement.

The EMWA meeting minutes from March 13, 1995 state that "Washington Township Trustees, Don Madden and Doug Culbertson presented petitions of those in the [Pleasant Grove-Adamsville Road area] who desire to become customers of [the EMWA]."  On June 12, 1995, the EMWA presented a project feasability study and instructed "the Trustees" to call on those interested to see if they would sign up for water service.  On July 10, 1995, a community meeting was called at the Washington Township fire house on Adamsville Road, and the minutes stated that some of the EMWA members, along with the Township Trustees, would "try to relay information to the public and answer any questions."  The August 14, 1995 minutes reflected the outcome of the community meeting:

> The Board of Trustees met with residents of Washington Township regarding the water line extension.  The tap fee was set at $1,500.00 for those signing up by December 1, 1995.  They are to come to the office and sign a contract and pay their money.  185 users are needed to complete the line to Edwards Lane as now proposed.

> The EMWA also put an advertisement in the "Legal Notice" section of the local newspaper

40

stating that the petition for water in the area would be reviewed by the Trustees or the EMWA on December 1, 1995.  The meeting minutes from December 11, 1995 reveal that too few residents (only sixty-five out of the necessary 185) signed up.  On January 8, 1996, one of the EMWA members was instructed to send a letter to "Don Madden, a Washington Township Trustee" suggesting a new water proposal: ninety-seven users in the Pleasant Grove-Adamsville Road area with a $1,500 tap fee.  On March 12, 1996, the EMWA discussed a request from the Trustees that $500 be accepted at the time of sign-up with $1000 paid after construction.  The EMWA denied the request and stated that the project would be abandoned if the quotas were not met by June 1, 1996. The project was indeed abandoned at that time for lack of interest from residents.

The basis of Plaintiffs' complaint  against the Township Defendants is that they made no similar efforts to bring water to the residents of Coal Run even though they were aware of the need and the requests from the residents.[14]   The Township Defendants argue that they had no duty or authority to bring water to anyone and that the efforts reflected in the meeting minutes were taken

---

[14]While Plaintiffs state that Coal Run residents appeared at the community meeting referred to in the EMWA meeting minutes in order to express interest in water—and the Township Defendants, therefore, should have then taken up their cause—the Plaintiffs only cite Bernard Kennedy's deposition, in which he stated that he did not recall anyone from the City, County, or Township present at the meeting.

While the Trustee Defendants testified that people in the Pleasant Grove-Adamsville Road area asked them for help in getting water (as members of the community and not as elected trustees) there is no evidence that Plaintiffs did the same.  Plaintiffs also state that Trustee Culbertson testified that Plaintiff Jerry Kennedy requested water from him in the summer of 2002.  The record reflects, however, that this was not a request, but an inquiry as to how to get water; the discussion took place while Jerry Kennedy was working on Culberston's house and was not submitted as a formal request, but rather, came up during casual conversation. Culberston advised Jerry Kennedy to submit a petition as he and other neighboring residents had done.  Plaintiffs rely solely on Culberston's testimony in their assertion of the Township's involvement, as Jerry Kennedy states that no Township official ever refused a request for public water.

by Donald Madden and Doug Culbertson in their personal capacities only, to help individuals in the community who took action themselves to petition the EMWA.[15]

---

[15]Donald Madden provided the following testimony:

Q.    Do you recall if you received phone calls directly about complaints [regarding water]?

A.    No, I think this was probably more as you would meet people and be in casual conversations. In fact, calling it complaints about water, I would term it more conversations and their desires to have East Muskingum water.

Q.    Did they ask you to do anything about their not having water?

A.    They would express their interest in whether there was anything I could do to help them receive water, yes.

Q.    They would ask you as a trustee, can you do something to help us?

A.    And my view at that point was that it wasn't an obligation or even a privilege that I would have as a trustee. It was more something that I would do just as being a member of the community, let's say, put in a leadership role that I was trying to help. I didn't feel that I was doing that as an elected official.

       ***

Q.    When you circulated the petitions were you the person that organized that?

A.    It was what I will call a community effort. I don't know that there was -- it wasn't anything that was formal where this person was in charge or whatever. It was simply a group of individuals out of the community that had an interest in trying to see East Muskingum – or encourage East Muskingum Water to extend the lines both to the firehouse and out State Route 93.  I don't know that I was any more, let's say, the lead person than several others that helped with it.

Q.    When you were circulating petitions did you have a meeting to say these are the petitions, go hand them out, this is what we are going to do? Do you recall that at all?

A.    I think it was so informal it may have been that I may have taken some and started in an area. We had, let's say, a neighbor that said yeah, I want to help and so he would take some and he may have divided it up and got his neighbor to help so it wasn't something that was where there was an organizational meeting and we chopped up a map and said here you go, get this 20 houses and I will get the next 20 or anything like that. It was just

42

More important for standing purposes, however, is that even if the Trustee Defendants would have "advocated" on behalf of the Coal Run residents, the EMWA served as the ultimate decisionmaker. The Township never had the ability to provide Plaintiffs, or anyone else, with water. Thus, given that Plaintiffs do not argue that the Township in any way blocked their efforts to obtain water from other Defendants, it cannot be said that the Township's actions *caused* Plaintiffs' alleged injury. For instance, the initial efforts on behalf of the Pleasant Grove-Adamsville Road project failed due to the fact that the requirements *of the EMWA*—not the Trustee Defendants—were not met. Plaintiffs contend that had the Trustees included the Coal Run residents in the plans, the

---

everybody kind of working together in an effort to canvass the whole area.

\*\*\*

Q.   So probably never occurred to you that no one asked the residents on Langan Lane or Coal Run Road that didn't have water whether they wanted to sign the petition?

A.   I know as a township trustee I was never approached by anybody asking for water service in that area.

Similarly, the testimony of James Krischak, who served as counsel for the EMWA supports the assertion that even though the EMWA timeline refers to Culberson and Madden as Trustees, they were in fact serving with others in a community effort to get water in their individual capacities.

Q.   Do you know whether or not there were any other residents who were non-Trustees that were also responsible for going out door-to-door?

A.   Oh, absolutely. Absolutely. This wasn't – there were -- Probably carriers of the petition, in reality, were not the Township Trustees. The ones that carried the petition were other neighbors that wanted water.

Q.   This was a collective effort by the residents in those areas that did not have access to water at that time; would you agree with that?

A.   Oh, absolutely.

project would have been economically feasible.[16]  Yet, Plaintiffs produce no evidence to support this assertion, and the Court is not persuaded that there exists causation between the Township Defendants' role as a liaison between the EMWA and residents actively petitioning for water, and the injuries Plaintiffs suffered.

Plaintiffs also attempt to hold the Trustee Defendants liable for Plaintiffs' injuries because the Township passed a 2001 Resolution necessary for the EMWA's eventual completion of the Pleasant Grove-Adamsville Road project in 2002.  In 1984, as part of an agreement with the City, the EMWA released its jurisdiction over an area including Coal Run, Pleasant Grove, and Adamsville Road.  Subsequently, when the EMWA began a water project in the Adamsville area, it decided that the project would be more economically feasible if the Pleasant Grove-Adamsville Road portion previously excluded from the EMWA's jurisdiction was re-incorporated because they knew (from the Trustees' 1995 discussions) that there was interest in that area.  The record reflects that the EMWA made plans for the project *before* realizing that it did not officially have jurisdiction over certain areas.  Mr. Krischak, the attorney for the EMWA, stated that, "it seems like, at the last minute, when they were looking at that particular project, someone raised their [sic] hand and said, 'Hey, all that area is not inside our district.'"  Mr. Krischak, therefore, drafted a resolution for the Township so the Pleasant Grove-Adamsville Road area could be added back into the EMWA's jurisdiction and the project could go forward.  Indeed, Plaintiffs stated that the EMWA "required

---

[16]Notably, the minutes from October 10, 1999, stated that the EMWA had received a letter requesting water service in the Forrest Hills Subdivision if the Pleasant Grove-Adamsville Road project did not have enough participants.  One of the EMWA members was instructed to advise the requester that no decision could be made at that time.  There is nothing in the minutes showing any requests for the Coal Run area, or that the additional neighborhoods would have changed the project feasibility.

the Township's actions in re-establishing its jurisdiction in order to provide water services to the Pleasant Grove area."

Even though the Township did pass the Resolution, the evidence shows that this was at the request of the EMWA and was not, as Plaintiffs argue, enacted by the Township Trustees for the purpose of providing water to white areas only. Even if the Trustees had not passed the Resolution, there is no reason to believe that Plaintiffs would not have incurred their injuries. The EMWA was the entity making the water decisions for the Pleasant Grove-Adamsville Road project, not the Township Defendants, and the plans for the project were in place before the jurisdictional technicality was addressed. In sum, the line of causation between the Township Defendants' actions and Plaintiffs' injury is not apparent, especially in light of the fact that, unlike other Defendants, the Township did not have the ability to provide Plaintiffs with the requested water service. Whatever the Township Defendants may have done, the injury complained of—lack of public water—resulted only from decisions made by the City, the County, and its predecessor, the EMWA. Therefore, the Township Defendants' Motion for Summary Judgement is **GRANTED** and they are dismissed as defendants in this matter.

Because Plaintiffs provide sufficient evidence that their injury is "fairly traceable" to the actions of the County and City Defendants, as they were *active in supplying water to residents* in the surrounding area, and Plaintiffs could be compensated for their injuries by a favorable decision in this case, they have constitutional standing to maintain their claims in this Court.

As for prudential limitations on standing, each Plaintiff is asserting his or her own legal interest rather than those of third parties. Although some of the Plaintiffs in this case are white or are organizations that lack a racial identity, such a factor is irrelevant to standing. "This court has

45

previously found that non-minorities have standing to maintain discrimination actions *for injuries suffered by them* as a result of racially discriminatory practices" against a racial minority. *Old West End Ass'n v. Buckeye Fed. Sav. & Loan*, 675 F. Supp. 1100, 1102 (N.D. Ohio 1987) (emphasis added) (citing *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205 (1972); *Harrison v. Otto G. Heinzeroth Mortgage Co.*, 414 F.Supp. 66 (N.D. Ohio 1976); *Watts v. Boyd Props., Inc.*, 758 F.2d 1482 (11th Cir. 1985)).  The white Plaintiffs are not resting on injuries suffered by their black neighbors; they are instead seeking relief for specific injuries they themselves suffered:  lack of public water service as a result of Defendants' alleged discrimination.  The organizational Plaintiffs also have alleged sufficient individual injuries, as stated above, to satisfy prudential limitations on standing.

Defendants' argument that certain Plaintiffs never made a request for public water services does not affect these Plaintiffs' standing to sue, but rather, is part of the *prima facie* case analysis, discussed below.  Further, the fact that some of the Plaintiffs have since moved from the Coal Run area does not affect their standing to sue for *past* injury, which can be redressed through monetary and declaratory relief.

## 2.  <u>Statute of Limitations</u>

All of Plaintiffs' federal law claims are governed by a two-year statute of limitations.  *See Tolbert v. Ohio Dep't. of Transp.*, 172 F.3d 934 (6th Cir. 1999) (holding that the plaintiffs' claims under Title VI, the FHA, §§ 1981, 1982, and 1983, were all governed by a two-year statute of limitations) (citing *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996) (holding that Ohio's general two-year statute of limitations is applicable to civil-rights claims brought in that state).  Therefore, subject to the continuing violation doctrine discussed below, Plaintiffs may not bring claims against

46

Defendants that accrued prior to November 13, 2001, which is two years prior to the filing of the Complaint in this case.[17]  Plaintiffs' State Law Claim is governed by a one-year statute of limitations.  Ohio Rev. Code § 4112.051 (providing that an aggrieved person may enforce the rights granted by § 4112.02 by filing a civil action within one year after the alleged unlawful discriminatory practice occurred).  Accordingly, subject to the continuing violation doctrine, Plaintiffs cannot bring a cause of action under § 4112.02 that accrued before November 13, 2002.[18]

---

[17]     Plaintiffs assume, without citation, and Defendants do not argue otherwise, that the two-year limitations period was tolled once their administrative complaints were filed with the OCRC.  Plaintiffs filed their administrative complaints with the OCRC on July 26, 2002.  The FHA, in 42 U.S.C. § 3613(a), provides:

> (1)(A) An aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice, or the breach of a conciliation agreement entered into under this subchapter, whichever occurs last, to obtain appropriate relief with respect to such discriminatory housing practice or breach.
>
> (B) The computation of such 2-year period shall not include any time during which an administrative proceeding under this subchapter was pending with respect to a complaint or charge under this subchapter based upon such discriminatory housing practice. This subparagraph does not apply to actions arising from a breach of a conciliation agreement.

An administrative proceeding under the referenced subchapter may be brought under section 3610, which allows an aggrieved person to file an administrative complaint with the Secretary of Housing and Urban Development ("HUD").  It is this filing that tolls the two-year statute of limitations, and even then, tolling is for FHA claims only not, as Plaintiffs assume, for all claims.  Because there is no evidence that Plaintiffs filed a section 3610 proceeding with HUD, tolling is not available.

[18]The Parties agree with respect to the one-year statute of limitations for the State Law Claim and the two-year statute of limitations for the FHA and §§ 1982 and 1983 claims.  Defendants assert that their § 1981 and Title VI Claims should be governed by the one-year statute of limitations set forth in the analogous state law, but case law is clear that the two year general tort statute is used for civil rights claims.  *See Tolbert*, 172 F.3d 934; *Black Law*

The main issue for this Court, however, is not the applicable statute of limitations, but rather: (1) when Plaintiffs' causes of action accrued such that the statute of limitations began to run; and (2) whether, notwithstanding the accrual of claims and the running of the statute of limitations, Plaintiffs can assert causes of action that occurred outside of the limitations period under the continuing violation doctrine.

### a.  Accrual of Claims - Beginning of Statute of Limitations

Federal law determines when the statute of limitations begins to run, that is, when the cause of action accrues. *Sevier v. Turner*, 742 F.2d 262, 272 (6th Cir. 1984).  "The statute of limitations commences to run when the plaintiff knows or has reason to know of the injury which is the basis of his action.  A plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence." *Id.* at 273 (citations omitted); s*ee also Tolbert*, 172 F.3d at 939. The plaintiffs in *Tolbert*, alleging the same federal claims asserted in this case, claimed that the Ohio Department of Transportation ("ODOT") made a racially based decision to utilize limited funds to provide sound barriers on a highway near a white neighborhood rather than on a highway near a black neighborhood.  The *Tolbert* Court held that, to the extent that the plaintiff residents claimed discrimination in the allocation of sound-mitigation measures, their cause of action did not accrue until their request for such measures was denied and they knew, or should have known, that ODOT was constructing the sound barrier elsewhere, in a discriminatory manner. *Id.* at 939 (citing *Sevier*, 742 F.2d at 273).  In the early 1980s, before the highway near the black neighborhood was

*Enforcement Officers' Ass'n v. City of Akron*, 824 F.2d 475, 482 n.6 (6th Cir. 1987) (holding that § 1981 actions are properly characterized as tort actions, and are subject to a state's statute of limitations for personal injury); Ohio Rev. Code § 2305.10 (providing two-year general statute of limitations for tort actions).

constructed, the Federal Highway Administration conducted an initial noise analysis for the project and prepared an Environmental Impact Statement (EIS).  The EIS recommended against building sound barriers around the highway because it would be "impractical" due to other noise pollution. The defendants approved the EIS in 1984.  When the defendants planned the highway close to the white neighborhood, they decided to construct sound barriers, despite the fact that the noise analysis conducted at that time recommended against it.  The *Tolbert* plaintiffs stated that they did not become aware of ODOT's plan to construct the barriers on the highway close to the white neighborhood until they saw such barriers being built in the summer of 1996.  Also in 1996, the plaintiffs requested that ODOT reopen the question of whether to provide noise-mitigation measures on the highway surrounding the minority residents.  ODOT refused to do so, stating that the plaintiffs could have attended meetings in the 1980s, when the decision was made that no sound barriers would be built around the black neighborhood.  Because their requests were denied in 1996 and they had no actual or constructive knowledge of the white-neighborhood barriers until the summer of that year, the Sixth Circuit held that their complaint filed in 1997 was timely with regards to any alleged discrimination claims.  In contrast, the court also held that the plaintiffs' claims arising out of ODOT's preparation and approval of the 1984 EIS accrued in 1984, more than two years before the filing of the complaint, and therefore, were time-barred.

Thus, under *Tolbert*, Plaintiffs' claims accrued, and the statute of limitations began to run, when Plaintiffs knew or should have known that Defendants were providing public water service to white neighborhoods even though Defendants were on notice of Plaintiffs' need for water. Defendants assert that Plaintiffs knew or should have known of their alleged injuries well before November 2001, and therefore, the statute of limitations ran before Plaintiffs filed their suit in

November 2003.  Further, Defendants argue that any Plaintiff who moved from Coal Run before

November 2001, could not have suffered any injury within the statue of limitations period, and

therefore, cannot maintain a cause of action.[19]  Plaintiffs do not dispute the applicable statute of

limitations or the accrual application, but argue that the continuing violation doctrine allows them

to pursue claims that accrued before November 2001, outside the limitations period.  Before this

Court determines whether Plaintiffs' claims are barred by the statute of limitations, therefore, it must

determine whether Plaintiffs may avail themselves of the continuing violation theory.

### b. Continuing Violation

The continuing violation doctrine has the effect of preserving discrimination claims based

on incidents that occurred outside of the limitations period if those incidents were part of a larger

discriminatory "practice" that continued into the limitations period.  *Havens Realty Corp. v.

Coleman*, 455 U.S. 363, 379 (1982).  The doctrine protects victims of discrimination or of other

wrongdoing who may not recognize violations as legally actionable until future incidents

demonstrate a pattern. *See Dasgupta v. Univ. of Wisconsin Bd. of Regents*, 121 F.3d 1138, 1139 (7th

Cir. 1997) ("A continuing violation is one that could not reasonably have been expected to be made

the subject of a lawsuit when it first occurred because its character as a violation did not become

clear until it was repeated during the limitations period.").  In *Havens*, the plaintiffs brought suit

against a real estate firm and its agents for racial steering in violation of the FHA.  The plaintiffs

cited five instances in which black and white testers were "steered" to homes in different

---

[19]Defendants also assert that many of the Plaintiffs never made a request to Defendants for public water, and therefore never had a claim accrue.  Whether Plaintiffs made a request for water, however, is an element of the prima facia case for discrimination, and, although relevant, it is not dispositive of whether Plaintiffs knew or should have known of their right to bring suit.

neighborhoods.  Although only one of these instances occurred within the applicable statute of limitations, the Supreme Court held that the plaintiffs' claims were timely.  Specifically, the Court instructed that where a plaintiff "challenges not just one incident of conduct violative of the [FHA], but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within [the applicable statute of limitations] of the last asserted occurrence of that practice." *Havens*, 455 U.S. at 381.[20]

The Sixth Circuit in *Tolbert*, addressing the same federal claims asserted in this case, applied a three-part test for determining whether a continuing violation exists for statute of limitations purposes.  First, a "defendant's wrongful conduct must continue after the precipitating event that began the pattern."  *Tolbert*, 172 F.3d at 940.  Second, "injury to the plaintiff must continue to accrue after that event."  *Id.* ("[A] continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation.").  Third, "further injury to the plaintiffs must have been avoidable if the defendants had at any time ceased their wrongful conduct."  *Id.*

Under the first prong, this Court must determine whether Defendants' alleged violations continued such that there is at least one occurrence of the asserted discriminatory practice within the statute of limitations period.  Plaintiffs state that the City, specifically through Water Superintendent Pletcher, denied taps to the Newman and Ford families in 2001 and 2002, while other non-minority families had been given the opportunity to tap into the Adamsville water line.  Further, it is undisputed that Plaintiffs Jerry and Richard Kennedy, Jr. attended a County meeting on December

---

[20]Although federal law determines when the statute of limitations begins to run, *Sevier*, 742 F.2d at 272, this Court notes that the continuing violation theory is also recognized in Ohio Administrative Code § 4112-3-01(D)(2), which states that "[i]n cases of recurring or continuing violations, the filing period begins to run anew with each new discriminatory act or with each new day of the continuing violation."

13, 2001 and expressed concerns about the lack of water in the Coal Run area.  Plaintiffs also assert that the County continued pursuing the Gaysport, Chandlersville, and Adamsville water projects, to the exclusion of the Coal Run project, despite the requests submitted by the Kennedy plaintiffs, through 2002.  Plaintiffs, therefore, have established at least one act within the statute of limitations period relating to the City and County Defendants.  Defendants argue that there is no evidence of any "systematic and repeated revisiting" regarding any decision to provide or not provide public water service.  The evidence shows, however, that even if Defendants did not revisit *specific* requests for water service, they faced multiple different requests and plans for water service many times throughout the last several decades, at which point they could have included the Coal Run neighborhood.

Moreover, Plaintiffs satisfy *Tolbert*'s second and third prongs because they allege continuous injury until they received water in 2004, and this injury would have been avoidable if Defendants had at any time ceased their alleged discriminatory conduct in denying water service to the Coal Run neighborhood.  In other words, if Defendants had not provided water to white residents, to the exclusion of the Coal Run residents, Plaintiffs likely would have had running water at an earlier time.  Defendants argue that Plaintiffs merely complain of "continual ill effects from an original violation" instead of from "continual unlawful acts."  To the contrary, Plaintiffs here are not alleging one request and denial, but rather a pattern of requests and denials, all while Defendants treated white residents differently.  Although under *Tolbert* passive inaction does not support a continuing violation theory, a pattern of denying requests of black and white residents from the same predominantly minority neighborhood, while granting those of others in white neighborhoods, is much more than passive inaction.  Plaintiffs' claimed injuries, therefore, are the result of continuing

52

unlawful acts, not just from the ill effects of an initial denial of public water service.

Finally, Defendants claim that Plaintiffs who moved from Coal Run before November 2001 cannot benefit from the continuing violations doctrine because they were not injured within the statute of limitations. This assertion undermines the purpose of the doctrine which is to allow claims for actions against an ongoing *practice* of discrimination, which may not be recognized until a pattern takes form in the future. Merely because residents have moved away from the neighborhood outside the applicable statute of limitations period does not mean that they lose their claims for an ongoing practice of discrimination, the earlier stages of which injured them while residing in the neighborhood.

### c.  OCRC Action

The City and County argue that the OCRC's complaint was untimely because it was issued more than a year after Plaintiffs filed a charge with the Commission. The OCRC's complaint, however, was issued within a year of the Plaintiffs' charges. Ohio law provides that the OCRC shall issue an administrative complaint within one year of a complainant filing a charge of discrimination with the OCRC:

> (5) If the commission fails to effect the elimination of an unlawful discriminatory practice . . . the commission shall issue . . . a complaint . . . .
> (7) Any complaint issued pursuant to division (B)(5) of this section . . . shall be so issued within one year after the complainant filed the charge with respect to an alleged unlawful discriminatory practice.

Ohio Rev. Code § 4112.05(B)(5), (B)(7).

In this case, the OCRC issued an administrative complaint within one year of the date Plaintiffs filed their charges. The individual Plaintiffs filed charges of discrimination on July 26,

2002, and the FHAA filed a charge of discrimination on August 5, 2002.  On July 10, 2003, the OCRC issued its complaint—within one year of the date the charges were filed. Therefore, the OCRC's complaint was timely.

The City's and County's confusion stems from the fact that after the OCRC issued its administrative complaint, Defendants "elected" to have a judicial resolution of the matter, pursuant to Ohio Rev. Code § 4112.051.  As a result of that election, the Attorney General was obligated to file a complaint in Common Pleas Court.  Ohio Rev. Code § 4112.051(A)(2)(b). The Attorney General complied and on December 19, 2003, filed that complaint.  Contrary to the City's suggestion, the filing of that judicial complaint by the Attorney General is not subject to the one-year requirement contained in Ohio Rev. Code § 4112.051(B)(7).  That requirement only applies to the issuance of the Commission's administrative complaint, which was timely issued.

### 3.   Merits of Plaintiffs' Discrimination Claims

The parties agree that because Plaintiffs predicate their discrimination claims on indirect evidence, Plaintiffs' substantive claims must be analyzed under the *McDonnell Douglas* framework.[21] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Mencer v. Princeton*

---

[21]  Plaintiff asserts claims under the FHA; §§ 1981, 1982, and 1983; Title VI; and Ohio state law.

The FHA makes it unlawful:

> (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

> (b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in

*Square Apts*., 228 F.3d 631 (6th Cir. 2000) (applying *McDonnell Douglas* framework to FHA, §§ 1981 and 1982, and § 4112.02(H)); *Amadasu v. Donovan*, 2006 WL 1401648, at \*7 (S.D. Ohio 2006) (applying *McDonnell Douglas* framework to Title VI claim).   The parties dispute, unsurprisingly, in how the test should be applied to the facts of this case.

Under *McDonnell Douglas*, plaintiffs have the burden of presenting sufficient evidence to make out a prima facie case of discrimination, meaning that the plaintiff must present enough evidence to give rise to an inference of discrimination.  If the plaintiff succeeds, the burden shifts to the defendant to present evidence of a legitimate, non-discriminatory reason for the challenged actions.  *McDonnell Douglas*, 411 U.S. at 802; *Texas Dep't. of Cmty. Affairs v. Burdine*, 450 U.S.

---

connection therewith, because of race, color, religion, sex, familial status, or national origin.

Title VI Provides:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1982 provides:

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

55

248, 252 (1981). The Plaintiff may then show that the reason offered by the defendant is merely a "pretext" for unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 804.

Plaintiffs assert that the prima facie case method established in *McDonnell Douglas* was "not intended to be an inflexible rule, as the [*McDonnell*] Court went on to note that '[t]he facts necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations.'" *Furnco v. Walters*, 438 U.S. 567, 577 (1978) (quoting *McDonnell Douglas,* 411 U.S. at 802 n.13). The *Furnco* Court explained further that "*McDonnell Douglas* did make clear that a Title VII plaintiff carries the initial burden of showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under the Act." *Id.* at 577 (internal quotations omitted).

Plaintiffs, in an effort to employ a more "flexible" prima facia standard in this case, assert that an inference of discrimination can be shown using statistical evidence, comparative evidence, evidence of a suspect sequence of events, or evidence of a subjective decision-making process. Plaintiffs then, restating the allegations from the presentation of facts, maintain that the statistical evidence, along with Defendants' subjective decision-making, differential treatment and departures from established procedures, all support an inference of discrimination. In *Maki v. Laakko,* 88 F.3d 361, 364 (6th Cir. 1996), the Sixth Circuit held that to state a prima facie case of housing discrimination under either 42 U.S.C. § 1981 or 42 U.S.C. § 3601, a plaintiff must show that: (1) he is a member of a protected class; (2) he applied for and was qualified to rent or purchase certain property or housing; (3) he was rejected; and (4) the housing or rental property remained available thereafter. *See also Patterson v. Guttman,* 225 F.3d 659 (6th Cir. 2000) (unpublished opinion)

(applying four-prong test to plaintiff's §§ 1981, 1982 and FHA claims); *Pollitt v. Bramel,* 669 F. Supp. 172, 175 (S.D. Ohio 1987) (same); *Middlebrook v. City of Bartlett,* 341 F. Supp. 2d 950 (W.D. Tenn. 2003) (holding that the black plaintiffs who sued the city and officials for allegedly refusing to provide water service to their property on racial grounds must show: (1) that they are members of a protected class; (2) they applied for and were qualified for water service; (3) such application and water service was denied; and (4) the defendant provided similarly situated individuals outside the protected class with water service).

Although the case law is clear that the four-prong test applies to Plaintiffs' claims, courts have shown flexibility in the actual prongs of the test.  For example, though most discrimination actions brought pursuant to the FHA, Title VI, §§ 1981 and 1982 involve allegations of discriminatory acts prompted by hostility to the *plaintiff's* race (who then easily satisfy the "protected class prong"), courts have also permitted cases in which the plaintiffs are negatively impacted by discriminatory conduct motivated by hostility towards another person's race.  *See Old West End Ass'n v. Buckeye Fed. Sav. & Loan,* 675 F. Supp. 1100, 1103 (N.D. Ohio 1987) (holding that white vendor plaintiffs stated a prima facie case under the Civil Rights Act, and §§ 1981 and 1982 by alleging that despite being creditworthy and having an independent appraisal stating that the value of the house equaled the sale price, the purchasers' loan application was denied for a home in a minority neighborhood); *see also Doane v. Nat. Westminster Bank,* 938 F. Supp. 149, 151-52 (E.D.N.Y. 1996) (holding that white owner of a home in a neighborhood that was 92.56 percent black stated a prima facie case under §§ 1981 and 1982 by alleging that despite being creditworthy and having an independent appraisal stating that the value of the house equaled the sale price, people interested in purchasing his home had their mortgage applications denied) (citing *Des Vergnes v.*

*Seekonk Water Dist.*, 601 F.2d 9, 13-14 (1st Cir.1979) (holding that non-minority developer could bring § 1981 action against water district based on its alleged refusal to include a tract of land intended for low-income minority housing in the water district)); *DeMatteis v. Eastman Kodak Co.*, 511 F.2d 306, 311-12 (2d Cir. 1975), modified on other grounds, 520 F.2d 409 (2d Cir. 1975) (holding that white plaintiff allegedly forced to retire because he sold his house to a minority could bring civil rights action against his employer); *Pisello v. Town of Brookhaven*, 933 F. Supp. 202 (E.D.N.Y. 1996) (holding that non-minority plaintiffs could bring § 1981 action against defendants who allegedly harassed plaintiffs for their efforts to find housing for minorities in the area)).

The Court in *Old West End* applied a four-prong test applicable to a situation in which plaintiffs themselves may not be members of a protected class, but have nevertheless incurred injuries as a result of the defendant's discrimination against a protected class:

> Construing, as we must, the evidence most favorably toward the plaintiffs, the plaintiffs have established that: (1) the housing sought to be secured was in a minority neighborhood; (2) that an application for a loan to purchase the housing located in a minority neighborhood was made; (3) that an independent appraisal concluded that the value of the housing equaled the sale price; (4) that the buyers were creditworthy; and (5) that the loan was rejected. These facts, the court believes, are sufficient to establish a prima facie case under both the Fair Housing Act and the Civil Rights Act.

*Old West End*, 675 F.Supp. at 1103.

Therefore, as applied to this case, to establish a prima facia case, Plaintiffs must show:

(1)     they were members of a protected class or residents of a protected-class neighborhood;

(2)     they submitted a request for public water service;

(3)     such requests were rejected; and

(4)     Defendants provided water service to similarly situated individuals outside the protected-class neighborhood.

### a.  Members of a Protected Class or Residents of a Protected-Class Neighborhood

There are eleven Plaintiffs who admit that their race is white, and the FHAA and the OCRC, as organizations, do not have a racial identity. Defendants assert that these Plaintiffs are not members of a protected class and cannot maintain their discrimination claims. As discussed above, however, Plaintiffs themselves do not have to be members of a protected class as long as they have incurred a specific injury based upon discrimination to members of a protected class. In this case, the white Plaintiffs have incurred specific injury (i.e., no public water service) because of the allegedly discriminatory practices of Defendants against these Plaintiffs' black neighbors.[22] Accordingly, Plaintiffs have satisfied the first element of the prima facie case.

### b.  Request for, and Denial of, Public Water Service

The County asserts that depositions were taken of all Plaintiffs in this case, and all but two admitted that they have not made any requests for public water to the County directly. The County contends that fifty-seven Plaintiffs gave an absolute "no" in their depositions to the question of whether they had ever requested public water service from the County, and the testimony from the remaining Plaintiffs indicates that, generally, they too did not request public water service from the County. The City states that fifty-six of the sixty-eight individual plaintiffs responded in depositions

---

[22]  Notably, the Supreme Court has held that the FHA's authorization of suits and administrative complaints by "aggrieved persons"—which includes "any person who claims to have been injured by a discriminatory housing practice"—reflects "a congressional intention to define standing as broadly as is permitted by Article III of the Constitution." *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972).

that they did not make requests to the City for public water. The City and the County conclude that the Plaintiffs who did not make specific requests to Defendants for public water service cannot make out a prima facia case. In light of the futile gesture doctrine often employed in federal discrimination cases, this Court rejects Defendants' assertion.

The futile gesture doctrine was recognized by the Supreme Court in *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977), when it affirmed a finding that a common carrier and union discriminated in hiring and promotions in violation of Title VII. Although many of the defendants' employees applied for, and were discriminatorily rejected from, promotions, other plaintiffs had not applied because of the defendant's well-known discriminatory policies. The company argued that the non-applicants were barred from recovery because they did not experience discrimination directly. The Supreme Court rejected the argument and held that those who would have applied but for the company's practices satisfied the prima facia case:

> [T]he company's assertion that a person who has not actually applied for a job can never be awarded seniority relief cannot prevail. The effects of and the injuries suffered from discriminatory employment practices are not always confined to those who were expressly denied a requested employment opportunity. A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection.
>
> If an employer should announce his policy of discrimination by a sign reading "Whites Only" on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs. The same message can be communicated to potential applicants more subtly but just as clearly by an employer's actual practices by his consistent discriminatory treatment of actual applicants, by the manner in which he publicizes vacancies, his recruitment techniques, his responses to casual or tentative inquiries, and even by the racial or ethnic composition of that part of his work force from which he has discriminatorily

60

> excluded members of minority groups.  When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application.

*Id.* at 365-66.

Recognizing that fair employment concepts are often imported into fair housing analysis, several courts have applied the futile gesture doctrine to housing discrimination cases.  *See Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447, 1451 (4th Cir. 1990) (applying futile gesture doctrine and finding it unnecessary in order to bring housing discrimination claim for a black purchaser to apply for property at housing development that she knew discriminated against blacks); *Darby v. Heather Ridge*, 806 F. Supp. 170, 174 (E.D. Mich. 1992) (stating that futile gesture doctrine is available where plaintiffs' interest in applying for housing was cut short by knowledge of defendants' discriminatory practices).

After studying the voluminous record in this case, this Court concludes that there is a genuine issue of material fact as to whether each Plaintiff's actions amount to a request to Defendants and whether those Plaintiffs who did not make a formal request to Defendants failed to do so because of the alleged discriminatory policies adopted by Defendants.  As stated in a March 2000 report issued by the City's Water Superintendent Pletcher, "For at least the last thirty-five years the residents of Coal Run . . . approached various members of the Zanesville Water Division as to the possibility of extending water into their neighborhood."  Water was not extended, however, until 2004.  Further, there is other evidence that several Plaintiffs made requests to the City through Superintendent Pletcher, whose office was at the City's water plant where many Plaintiffs filled containers with water to take home.  As early as the 1970s, Plaintiffs also requested water from the

EMWA—for which the County has successor liability—and such requests were denied.  The County concedes that Plaintiffs Richard Kennedy, Jr. and Jerry Kennedy made a request to the County for public water service.  Plaintiffs signed petitions, attended public meetings, delivered a petition "To the County," made phone calls to City and County officials and were ignored, directed to other authorities, advised to dig wells, or told that their requests for extensions or tap-ins were not feasible.  Thus, aside from being futile, these requests made by some Plainitffs put Defendants on constructive notice that the neighborhood itself needed public water, thus eliminating the need for each and every Plaintiff to give specific notice.

Given that there was not a formal or organized process to request water in the rural area in which Plaintiffs reside (as evidenced by the confusion of jurisdiction among water authorities and government bodies), this Court will not hold Plaintiffs to a strict standard of submitting a formal request via a process that was apparently unknown and constantly changing.  Nor will this Court prevent Plaintiffs who would have requested water, but for Defendants' alleged discriminatory practices, from having their rightful day in court.  The record shows that individuals from Coal Run tried on multiple occasions to get water for their families, but were unsuccessful, and likely frustrated by the rejection and finger-pointing between the actors in public water service.  Further, because the Coal Run neighborhood is a small, close-knit community, there is a genuine issue of material fact as to whether those Plaintiffs who did not formally call Defendants, submit a petition, or attend a public meeting failed to do so because of their knowledge of Defendants' alleged discriminatory policies with respect to public water service.  Therefore, this Court finds that all Plaintiffs meet the second and third prongs of the prima facie case.  Further, it is undisputed that many predominantly white neighborhoods surrounding Coal Run received water service from the

City and County Defendants; thus, the fourth prong is also satisfied.

### c. Burden Shifting Analysis

Plaintiffs have therefore made out a *McDonnell Douglas* presumption of discrimination and the burden to rebut such inference, as explained by the Supreme Court in *Burdine*, shifts to Defendants:

> The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.

*Burdine*, 450 U.S. at 254-56.

Defendants offer several legitimate, non-discriminatory explanations for their actions. The County, however, rests its explanation on the incorrect assumption that it is not liable for the actions taken by the EMWA. Further, Plaintiffs point to a genuine issue of material fact as to whether those explanations provided by the County are mere pretexts for discrimination. First, the County states that when it was presented with the idea of the Coal Run water project in 2000, based on the City's

report that a project would cost close to $2 million, the Commissioners determined that they would not "debt-service such a great amount" on the residents of Coal Run. Instead, the County waited for the Pleasant Grove project to be completed, which would provide a close source of water for the proposed Coal Run extension. Plaintiffs respond by presenting evidence that the County made no independent assessment of the cost of a Coal Run project or researched the possibility of Plaintiffs connecting to the Pleasant Grove line until after Plaintiffs filed discrimination complaints, yet it commenced projects in predominantly white areas without similar "debt-service" concerns.

Similarly, the City offers several explanations for its inability to provide public water services to Plaintiffs. The City claims it could not provide water because it lacked ownership of the water lines in the Coal Run area, there was insufficient infrastructure to provide water to all residents, the City could not extend lines into other water district service areas, and it could not review new applicants for water until WRWA was terminated in 1998. Again, however, the Plaintiffs provide evidence that creates a genuine issue of material fact as to whether such explanations are mere pretexts for discrimination. First, the City's assertion that it could not operate water lines outside the City limits is contradicted by the fact that it operated the Old Adamsville Road line, which was outside the City limits. Second, regardless of ownership, Plaintiffs have provided evidence that the City *ultimately* decided who would tap into City water lines. Last, Plaintiffs have shown that despite "insufficient infrastructure" to provide water to all residents, white households were permitted to tap into the Adamsville Road line, while Coal Run residents were turned away.

Based on this evidence, a jury could conclude that Defendants' explanations for not providing public water to the Coal Run residents is merely a pretext for racial discrimination, and

summary judgment is inappropriate.

### 4. **Injunctive Relief**

It is undisputed that water service was extended to the Coal Run/Langan Lane neighborhood by January 2004.  No other allegations of alleged discrimination are present in the Complaint. Plaintiffs have no remaining case or controversy with these Defendants that would justify the equitable relief sought.  Standing to seek injunctive relief depends on the likelihood of future injury to Plaintiffs.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 107-09 (1983).  Absent a showing of continuing irreparable injury and a lack of adequate remedy at law, which Plaintiffs fail to establish, injunctive relief is not available.  *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1068 (6th Cir. 1998). Summary judgment as to Plaintiffs' request for injunctive relief is, therefore, granted in favor of Defendants.

### 5. **Punitive Damages**

The County and City, citing *City of Newport v. Fact Concerts*, 453 U.S. 247, 271 (1981), both argue that punitive damages cannot be recovered against a municipality.  Further, the County and City state that, for non-constitutional claims, Ohio law bars recovery of punitive damages against political subdivisions of the State, which include municipalities.  Ohio Rev. Code § 2744.05. Plaintiffs do not present any argument otherwise.  Therefore, summary judgment is granted in favor of Defendants.  Plaintiffs are not entitled to punitive damages.

### 6. **Immunity**

#### a.  **Qualified Immunity (individual County Defendants)**

Qualified immunity, or "good faith" immunity, is an affirmative defense that the defendant

officer must raise.  *Siegert v. Gilley*, 500 U.S. 226 (1991).  Qualified immunity is generally a question of law to be decided by the court.  *Hunter v. Bryant*, 502 U.S. 224 (1991). The Supreme Court set an objective standard for determining when qualified immunity applies:  "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Burchett v. Keifer*, 310 F.3d 937, 942 (6th Cir. 2002).

Courts should engage in a two step analysis when determining if an officer is entitled to qualified immunity.  *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004).  First, the court must consider whether the officer violated a constitutional right.  *Id.*  Second, the Court should determine if the right is one that is clearly established such that a reasonable officer should know that his conduct violates the right.  *Id.*  The Court should examine whether the plaintiff has offered sufficient evidence to indicate that the official's action was objectively unreasonable in light of the plaintiff's clearly established constitutional rights.  *Feathers v. Aey,* 319 F.3d 843, 847 (6th Cir. 2003) (quotations and citations omitted).  In doing so, the Court should look to the preponderance of the evidence and not clear and convincing evidence.  *Crawford-El v. Britton*, 523 U.S. 574 (1998).

Plaintiffs allege that Defendants discriminated against them on the basis of their race.  If these allegations are true, Defendants violated Plaintiffs' right to equal treatment under the law.  The Civil Rights Acts and the Fair Housing Act, along with the other federal statutes which form the basis of Plaintiffs' complaint, clearly establish Plaintiffs' right not to be discriminated against on the basis of race in their procurement of water, a vital resource.  *See, e.g., Southend Neighborhood*

*Imp. Ass'n v. St. Clair County*, 743 F.2d 1207, 1209 (7th Cir. 1984); *United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach*, 493 F.2d 799, 811 (5th Cir. 1974). The sort of discrimination alleged in the Complaint is objectively unreasonable in light of the well-established law that state officers may not exclude persons based on race from important municipal services.

Plaintiff's complaint, however, does not evince how the County Commissioners acted in their individual capacities in these events. This is undisputed. Therefore, the claims against the Commissioners in their individual capacities are dismissed.

### b. State Statutory Immunity (City and County)

The County and the City argue that they are immune from Plaintiffs' State Law Claim. Defendants are incorrect. In determining whether Defendants are entitled to immunity, this Court must examine Ohio state law to ascertain the nature of the immunity, if any. *Powell v. Morris*, 184 F.R.D. 591, 597 (S.D. Ohio 1998) ("When faced with a claim of immunity to a pendent state claim, federal courts look to the appropriate state law to ascertain the nature of the immunity given."). Thus, if a state statute exists under which a Defendant may have immunity from state law claims, the federal court is divested of jurisdiction until the Ohio Court of Claims has determined whether immunity is applicable. *See, e.g., Haynes v. Marshall*, 887 F.2d 700, 705 (6th Cir. 1989).

The County relies on Ohio Rev. Code § 2744.02(A) in claiming that they are immune from suit under state law. Section 2744.02(A) states:

> (A)(1) For the purposes of this chapter, the functions of political subdivisions are hereby classified as governmental functions and proprietary functions. Except as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function.

The County's argument fails because Ohio Rev. Code § 2744.02(B)(5) states, in relevant part that "a political subdivision is liable for injury, death, or loss to person or property when civil liability is expressly imposed upon the political subdivision by a section of the Revised Code." Ohio Rev. Code § 4112.02(H) states that it is unlawful for a "person" to discriminate on the basis of race in certain areas regarding housing. Ohio Rev. Code § 4112.01(A)(1) includes a political subdivision within the definition of "person." *See Albert v. Trumbull County Bd. of Mental Retardation*, 1999 WL 957066 (Ohio App. Sept. 20, 1999) ("a political subdivision and its employees may be liable for discriminatory practices pursuant to various provisions within R.C. Chapter 4112"). Thus, given that the Ohio Revised Code expressly imposes liability on a political subdivision if it violates Section 4112.02(H), the County's immunity claim fails.

The City relies on Ohio Rev. Code §§ 2744.09(B) and (C) in claiming that it is immune from suit under state law:

> (B) Civil actions by an employee, or the collective bargaining representative of an employee, against his political subdivision relative to any matter that arises out of the employment relationship between the employee and the political subdivision;

> (C) Civil actions by an employee of a political subdivision against the political subdivision relative to wages, hours, conditions, or other terms of his employment.

These sections state that an employee of a political subdivision may not sue the political subdivision regarding any matters relating to his employment. The City attempts to analogize these sections to the instant events. Its attempt to do so is unavailing in light of the fact that Ohio Rev. Code § 4112.05(H) specifically imposes liability against municipalities for discriminatory acts in a housing context.

### 7. <u>Laches, Waiver, Estoppel</u>

The City also asserts the defenses of laches, waiver, estoppel, and equitable tolling.  Laches requires (1) proof of lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the defendant.  *See Kansas v. Colorado*, 514 U.S. 673, 687 (1995).  Defendants have not shown lack of diligence by Plaintiffs or prejudice to themselves.  Moreover, while Defendant's brief section is titled "Laches, Waiver, Estoppel, and Equitable Tolling," the only arguments that appear within the section address laches.  Therefore, Defendant has waived its other arguments at this stage in the proceedings.

### V.  CONCLUSION

Based on the forgoing reasons, this Court **GRANTS** Plaintiffs' Motion for Partial Summary Judgment; **GRANTS** the Township Defendants' Motion for Summary Judgment and dismisses them as defendants in this case; and **GRANTS in part and DENIES in part** the City's and County Defendant's Motions for Summary Judgment.  Specifically, the Court **GRANTS** the City's and County's Motions for Summary Judgment as to Plaintiffs' demand for injunctive relief and punitive

damages and Plaintiffs' claims against the County Commissioners in their individual capacities; the

Court **DENIES** their motions in all other respects.

**IT IS SO ORDERED.**

           <u>s/Algenon L. Marbley</u>
**ALGENON L. MARBLEY**
**United States District Court Judge**


**DATED: September 7, 2007**